**FOREST SERVICE EMPLOYEES FOR ENVIRONMENTAL ETHICS, Plaintiff,**

v.

**UNITED STATES FOREST SERVICE, an agency of the U.S. Dept. of Agriculture, Defendant.**

**No. CV–03–165–M–DWM.**

United States District Court, D. Montana, Missoula Division.

Jan. 11, 2008.

Charles M. Tebbutt, Eugene, OR, Marc D. Fink, Attorney at Law, Duluth, MN, Timothy M. Bechtold, Rossbach Hart Bechtold, Missoula, MT, for Plaintiff.

Mark Steger Smith, William W. Mercer, Office of the U.S. Attorney, Billings, MT, Thomas L. Sansonetti, U.S. Department of Justice, General Litigation, Washington, DC, Emma T. Pawlicki, Pacific Legal Foundation, Sacramento, CA, for Defendant.

## ORDER

DONALD W. MOLLOY, Chief Judge.

The environmental laws and policy in this nation are set by Congress. Congress enacted the laws at issue in this case, the National Environmental ·Policy Act ("NEPA") and the Endangered Species Act ("ESA"). Executive agencies—here, the United States Forest Service—must execute the laws Congress enacts. The obligation is to faithfully execute the laws. The Forest Service has, throughout these proceedings, evidenced a strategy of circumventing, rather than complying with, NEPA and ESA. The apparent pattern suggests a strategy of looking for ways to avoid the law's mandate as opposed to looking for a means of complying with the law. The issue to be decided here is whether the Forest Service has complied with the laws it is charged with executing and with this Court's orders directing it to do so. If it has not, a secondary issue is whether the Forest Service should be held in contempt and subjected to coercive sanction. In my view, the Forest Service is in contempt of the law and the prior orders of this Court. Nonetheless, a hearing is appropriate before reaching a final conclusion on that issue.

## I. Background

The record here shows the Forest Service uses an average of 15 million gallons of fire retardant each year, though in some years as many as 40 million gallons have been used. In the most severe fire seasons, millions of acres of land burn under tens of thousands of wildfires, many in national forests. The United States Forest Service considers chemical fire retardant an important firefighting tool. In October of 2003, Plaintiff filed suit in this Court seeking a declaratory judgment that the Forest Service was, with respect to its use of chemical fire retardant, in violation of NEPA and ESA. They also wanted an injunction compelling the Forest Service to comply with the law.

Plaintiff's Motion for Contempt argues that the Forest Service is in contempt of this Court's orders that it comply with NEPA and ESA concerning the use of chemical fire retardant. The orders in issue are, specifically, 1) the September, 2005 order in which I ordered the Forest Service to comply with NEPA and begin formal consultations with the Fish and Wildlife Service ("FWS") as required by section 7 of ESA; 2) the February, 2006 order in which I again ordered the Forest Service to comply with NEPA regarding the aerial use of fire retardant and set a deadline for compliance of August 8, 2007; and 3) the August 17, 2007 order in which I granted the Forest Service an extension until October 10, 2007, to show compliance with the law and the Court's orders, and setting a contempt hearing for October 15, 2007, in the event the Forest Service did not demonstrate compliance by the October 10, 2007 extended deadline.

On October 10, 2007, the Forest Service filed a Notice of Compliance. The notice was accompanied by several documents, including an environmental assessment ("EA"). The same day, Plaintiff filed its Motion for Contempt. The next day, October 11, 2007, the Forest Service filed a Decision Notice of a Finding of No Significant Impact (DN/FONSI), apparently in response to the argument Plaintiff raised in its Motion for Contempt. On October 12, 2007, I issued an order vacating the contempt hearing set for October 15, 2007, to have time to consider whether the Forest Service complied with the prior orders in this case. The order stated that "Secretary Rey, on further notice, shall be prepared to appear and show cause why he should not be held in contempt, and jailed until the contempt has been purged by compliance with the laws enacted by the Congress of the United States, including NEPA and ESA."

The Forest Service did file the 2001 EA, which has been compared to the 2006 EA filed with the Forest Service's Notice of Compliance. The parties have further briefed the issues in reply and sur-reply briefs. The Court has perused the evidence the Forest Service filed to counter the contentions in Plaintiff's Motion for Contempt, and has carefully considered the arguments the parties have presented in their briefs. I have given particular attention to the documentary evidence the Forest Service filed in support of its claim that it has complied with the law and the Court's orders and should therefore not be held in contempt.

## II. Analysis

### A. Compliance with the National Environmental Policy Act

Plaintiff presents a persuasive argument that the Forest Service has not complied with the Court's order to comply with NEPA. The argument is based·on the regulations implementing NEPA, specifically, 40 C.F.R. § 1501.4, which is titled "Whether to prepare an environmental impact statement ['EIS']." Paragraph (a) of section 1501.4 of 40 C.F.R. allows an agency (e.g., the Forest Service) to first determine, according to "its procedures supplementing these regulations," whether the proposal under scrutiny (here, the use of chemical fire retardant) is one which normally requires an EIS or is categorically excluded from the need for either an EIS or an EA.

If the proposed action "is not covered by paragraph (a)," the agency must prepare an EA, and in doing so "involve environmental agencies, applicants, and the public." The regulation refers to the definition of an EA found at 40 C.F.R. § 1508.9(a)(1), which is "a concise public document for which a federal agency is responsible that serves to briefly provide sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact." Once the EA is complete, the agency must then determine, "based on the EA," whether to prepare an EIS. 40 C.F.R. § 1501.4(c). If the agency "determines on the basis of the EA not to prepare [an EIS]," the agency must "prepare a finding of no significant impact." 40 C.F.R. § 1501.4(e).

Plaintiff argues that all the Forest Service has done in this case is produce and file an EA. Plaintiff correctly argues that this is only a step toward complying fully with NEPA. The Forest Service responds with two arguments. First, it argues that its response to the Court's orders, evaluated against the legal standards governing the Court's use of its contempt power, is reasonable, and therefore the Court should not hold it or Mr. Rey in contempt. Second, it argues that the DN/FONSI, filed a day after the Court's October 10 deadline and apparently in response to Plaintiff's

Motion for Contempt, was completed prior to the date it was signed and filed with the Court (October 11, 2007) and it demonstrates compliance with NEPA.

As for the first argument, the Forest Service argues that on a Motion for Contempt, Plaintiff must present clear and convincing evidence of non-compliance with a specific and definite order of the Court. *See F.T.C. v. Affordable Media, LLC,* 179 F.3d 1228, 1239 (9th Cir.1999). It then notes that when a Court's Order is not clear as to what is required for compliance, if the party allegedly in contempt has acted reasonably in response to the order, the party should not be held in contempt. *Vertex Distrib. v. Falcon Foam Plastics, Inc.,* 689 F.2d 885, 889 (9th Cir.1982).

The Forest Service offers no argument, however, from which the conclusion follows that the orders are not clear as to what is required for compliance. The Order required the Forest Service to comply with NEPA. This requires complying not only with the statutes in question, but also with the regulations implementing the law. The Forest Service makes no argument to the contrary. Instead, it proceeds to its second argument, claiming that it "did not issue the FONSI simultaneously with the EA because it recognized that the outcome of the consultation process [pursuant to the ESA] could affect the Forest Service's ultimate decision on the aerial use of fire retardant." Issuing a FONSI prior to the completion of the consultation process, the Forest Service argues, would leave it open to accusations by Plaintiff that it had "improperly prejudged its decision." Based on this argument, the Forest Service asserts it was reasonable to conclude that it "could best comply with NEPA and this Court's Orders by completing the EA, albeit recognizing that further analysis may be required pending the completion of the ESA consultation, and withholding the is-

suance of a FONSI until the results of the consultation process were known."

It is difficult to imagine how the Forest Service expects this argument to be construed. One possible interpretation is that the Forest Service admits it did not comply with the Court's orders as a litigation strategy—i.e., if it complied with NEPA and issued the FONSI, Plaintiff would accuse it of non-compliance, so it did not comply. Or, it may be claiming it is unreasonable to expect a party to comply with one law (NEPA) when the party has not yet complied with another law (ESA). This seems the more plausible construction, but the Forest Service does not explain, anywhere in its briefing, that the results from an ESA consultation are necessary before an agency can comply with NEPA.

This may, however, reflect agency practice. The Forest Service refers in one of its briefs, to the "natural inter-relationship between the NEPA and ESA consultation processes," and claims that waiting for the completion of one before issuing a decision on the other is reasonable, or at least substantial compliance with the Court's orders, which eliminates the possibility of a finding of contempt. *See General Signal Corp. v. Donallco,* 787 F.2d 1376, 1379 (9th Cir.1986). Lending some support to this argument (again, it is not clear the Forest Service is making this argument) the regulations state, as noted above, that if a proposed action "is not covered by paragraph (a),"—thus qualifying for a categorical exclusion—the agency must "prepare an EA," and in doing so "shall involve *environmental agencies,* applicants, and the public." 40 C.F.R. § 1501.4(b) (emphasis added).

Considering this last interpretation of the Forest Service's argument, Christopher Wehrli, the Interdisciplinary ["ID"] Team Leader for the Aerial Use of Fire

Retardant NEPA project, states in his Third Declaration:

> The characterization in Plaintiff's reply memorandum of the FONSI in this case as 'hastily-prepared' is incorrect. A draft FONSI was prepared by the ID team along with the final October 2007 EA and was in existence prior to October 10, 2007. The FONSI was not finalized at the time the EA was filed with the Court because consultation with the Fish and Wildlife Service was not completed. The FONSI was signed following the filing of Plaintiff's motion of contempt.

Third Wehrli Decl. ¶ 12. Furthermore, the DN/FONSI states, "My decision is contingent upon receiving a 'no jeopardy' Biological Opinion from the [FWS]."

In short, the Forest Service's best argument seems to be that it complied with the Court's order regarding consultation with the FWS pursuant to the ESA, which in turn prevented it from finalizing its decision notice pursuant to NEPA, and this in turn allows Plaintiff to mount a "largely technical challenge" based on an "unreasonable formalistic interpretation" of this Court's orders. As explained below, however, any persuasive force this argument might have is eviscerated when the Forest Service's actions throughout the ESA consultation process are considered.

## B. Compliance with the Endangered Species Act

The Court ordered the Forest Service to begin formal consultations with FWS as required by section 7 of ESA. As the foregoing discussion shows, the Forest Service has, at this point in time, done this. Consistent with its argument that it waited to file a decision notice in the NEPA context because the consultations required by the ESA were not complete, Defendant cites to *Badgley v. Santacroce*, 800 F.2d 33, 36 (2nd Cir.1986), in which the court reversed the contempt order of a district court because "an order of civil contempt is appropriate 'only when it appears that obedience is within the power of the party being coerced by the order.'" (quoting *Maggio v. Zeitz*, 333 U.S. 56, 69, 68 S.Ct. 401, 92 L.Ed. 476 (1948)). "A court's power to impose coercive civil contempt is limited by an individual's ability to comply with the court's coercive order." *Id.* (citing *Shillitani v. United States*, 384 U.S. 364, 371, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); *Maggio v. Zeitz*, 333 U.S. at 72–73, 68 S.Ct. 401). "A party may defend against a contempt by showing that his compliance is 'factually impossible.'" *Id.* (citing *United States v. Rylander*, 460 U.S. 752, 757, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983)). The Forest Service suggests that if the Court concludes it did not comply with NEPA, then to the extent they did not comply, it cannot be held in contempt because compliance was contingent upon an event beyond their control—the FWS completing its end of the formal consultation process.

The Forest Service does *not* note, however, that in *Badgley* the Second Circuit went on to say, "In raising this defense, the defendant has a burden of production ... that may be difficult to meet, *see Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 713 (D.C.Cir.1974); *Aspira of New York, Inc. v. Board of Education*, 423 F.Supp. 647, 654 (S.D.N.Y. 1976), particularly in cases such as this where the defendants have a long history of delay and the plaintiffs' needs are urgent, *cf. Fortin v. Commissioner of Massachusetts Department of Public Welfare*, 692 F.2d 790, 797 (1st Cir.1982)." *Id.*

While the Forest Service seems to assert that the interrelationship of NEPA and ESA requirements explain its actions and demonstrate that it has complied with

the Court's orders, it does not explain this interrelationship. It simply makes the conclusory assertion, assuming it is self-evident, that complying fully with NEPA—which here means issuing a decision on whether to prepare an EIS—requires receiving and incorporating the results of consultations the ESA requires. This is the crux of the Forest Service's argument that it should not be held in contempt for failing to comply with NEPA—it waited for the consultation results, the timing of which was beyond its control. Unfortunately, the record documents the Forest Service submitted along with its Notice of Compliance cast a dark shadow of doubt on the integrity of this proposition.

The Forest Service consulted with two agencies pursuant to the ESA: the Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (collectively, "the Services"). The documented record of the Forest Service's conduct during the consultation process shows that it, and not the other Services, was responsible for any delay in the process that contributed to the Forest Service's alleged non-compliance with the Court's orders. The record in this case shows the Forest Service had no real intention to comply with the law or the Court's Orders. For example, the NMFS's biological opinion sets forth in detail the history of the consultation process between the Forest Service and the NMFS, a history which undermines the Forest Service's argument that if it has not complied with NEPA this is because of events beyond its control. The biological opinion's "consultation history" section indicates the following:

1. In *November of 2006*, the Forest Service represented to the NMFS that to comply with the Court's *September, 2005* order it needed the NMFS's consultation results by *August 8, 2007*, and would therefore provide the NMFS with an EA by *December 1, 2006*. The Forest Service did not provide a final draft EA with request for comments, however, until *March 23, 2007*, and did not provide a final EA until *July 2, 2007*, five weeks before the initial deadline for compliance set forth in the Court's *February 6, 2006* Order;

2. A year later, in February, 2007, the Forest Service told the NMFS that it wanted to consult only on its use of the 2000 Guidelines for Aerial Delivery of Retardant or Foam Near Waterways, and not on the use of fire retardant generally. The NMFS responded that, in its view, the use of the guidelines was an issue included in the broader action of the use of fire retardant generally and was therefore part of the agency action subject to consultation;

3. When the NMFS received the final draft EA in March of 2007, it offered two comments. First, it noted that the use of fire retardant needed to be the proposed action, and, second, it noted that the effects of retardant use needed to be addressed in the effects section of the EA;

4. When the NMFS received from the Forest Service the final EA on *July 2, 2007, it also received a formal request to begin consultation*—one-and-a-half years after the Court's February, 2006 order. At this time, the NMFS noted that the EA did not analyze any of the chemicals proposed for use;

5. On July 13, 2007, less than a month before the deadline for compliance, during a conference call between the Forest Service and the NMFS, the NMFS informed the Forest Service that it could not initiate formal consultation because the Forest Service

had not complied with three of the six criteria that 50 C.F.R. § 402.14 requires to begin formal consultation. The NMFS informed the Forest Service that it had drafted a letter to this effect, and the Forest Service asked the NMFS to wait 30 days before sending the letter so the Forest Service could seek an extension from this Court;

6. On July 24, 2007, the NMFS requested an update on the Forest Service's progress;

7. On July 30, 2007, the NMFS received an updated Aquatics Report. The Report indicated that the chance of fish kills was greater if retardants entered higher pH streams. It did not address further the introduction of retardant into waterways because, according to the Report, the Forest Service did not intend to introduce retardants into any streams;

8. On August 7, 2007, the day before the initial deadline for compliance in the Court's February 6, 2007 Order, the NMFS provided the Forest Service with "six journal articles on the effects of fire retardant to fish that would help [the Forest Service] complete their analysis";

9. On August 29, 2007, after receiving an extension from this Court, the Forest Service sent a combined Aquatics Report and Biological Assessment to the Services. "Despite concerns that the effects of the program warranted a comprehensive evaluation, the Services agreed to initiate consultation without responses to all of the requested information in an effort to meet the Forest Service's [court-extended] deadline of October 15, 2007";

10. On September 20, 2007, the NMFS notified the Forest Service that the NMFS's draft biological opinion found the proposed action was likely to jeopardize the continued existence of several anadromous fish species and would destroy or adversely modify their designated critical habitat. That evening, the NMFS provided a suggested Reasonable Prudent Alternative to the Forest Service;

11. On September 25, 2007, three weeks before the October 15, 2007 deadline, the Services met with the Forest Service to discuss NMFS's effects determination and Reasonable Prudent Alternative. At this meeting the Forest Service provided additional information to the Services, "including some information on [the Forest Service's] decision making process and post-fire evaluation that is apparently standard within the [Forest Service], but [was] not relayed to the Services earlier in the consultation."

This history shows that the NMFS did not receive from the Forest Service a formal request to begin consultation until July 2, 2007, five weeks before the Court's original deadline for compliance and three-and-a-half months before the extended deadline. All of this activity took place more than one year after the Forest Service was ordered to comply with NEPA and the ESA. It shows that the NMFS was still skeptical, as of August 29, 2007, about whether the Forest Service had complied with the regulatory requirements for consultation, but went ahead to help the Forest Service meet the extended deadline of October 15, 2007. The record reveals a pattern of conduct showing the Forest Service either deliberately disregarded the obligations attendant to its role

in the consultation process, or performed these obligations only perfunctorily. In any event, the Forest Service did not engage in the consultation process with an effort meant to facilitate efficient and timely completion of the process. To the contrary, consistent with its conduct throughout these proceedings, the Forest Service has had little regard for its obligations under applicable laws and regulations.

Moreover, the NMFS found the proposed action likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. For this reason, the NMFS produced an extensive set of Reasonable Prudent Alternatives ("RPAs"), each of which direct the Forest Service to perform the most basic testing and monitoring one would expect the USFS to have considered before issuing a DN/FONSI. For example, the RPAs that the Forest Service incorporated into its DN/FONSI mandate that the Forest Service *must:* 1) provide evaluations of the toxicity of two retardants for which no acute toxicity tests have been conducted; 2) provide toxilogical studies on the effects of retardants on listed resources; and 3) establish guidelines for evaluating the quality of waterways into which retardant has entered.

It is thus less than clear that the Forest Service's DN/FONSI, which "incorporates the [NMFS's] reasonable, prudent alternative to avoid jeopardy to the continued existence of any endangered or threatened species or critical habitat" and "is contingent upon receiving a 'no jeopardy' Biological Opinion from the [FWS]" is based on an EA that, as 40 C.F.R. § 1508.9(a)(1) requires, "provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no signifi-

cant impact." It is impossible to conclude that an EA based on something other than the most basic scientific testing of the chemicals at issue and their effects on the environment provides sufficient evidence from which to determine whether to prepare an EIS.

As for the Forest Service's consultation with the FWS, the story is similar. The Court, on *September 30, 2005,* ordered the Forest Service to begin formal consultation with FWS pursuant to the ESA. The documents the Forest Service has provided this Court include a letter from Dale Hall of FWS to Thomas Harbour of the Forest Service, in which Mr. Hall "acknowledges the [FWS's] receipt of your *June 28, 2007,* letter requesting initiation of formal section 7 consultation pursuant to the [ESA]." The FWS received the Forest Service's request to begin formal section 7 consultation almost two years after this Court ordered the Forest Service to begin the consultation process. There is no date type-written on the letter, but it seems to have been faxed from the FWS to the Forest Service on October 10, 2007, the date of the Court's extended deadline to show compliance.[1] In the letter, Mr. Hall notes, consistent with the NMFS's consultation history, that FWS "received the revised Biological Assessment (BA) with the final requested supplemental information on August 29, 2007 and regard[s] this as the date upon which this consultation was initiated." The FWS, then, was able to begin in late August of 2007 the process the Court ordered in September of 2005. Not until almost two years after the Court's Order, three weeks after the first deadline, and five weeks before the deadline to show compliance with the Court's orders, was the FWS able

---

1. The faxed copy of the letter shows the date it was faxed from the FWS to the Forest Service on October 10, 2007, and the letter is stamped with the same date, likely by the Forest Service upon receipt.

to begin the consultation process. The Forest Service's position, that if it did not comply with NEPA it cannot be held in contempt because of circumstances beyond its control, is duplicitous at best. A straight reading of the record here indicates that the Forest Service had no intention to comply with the Court's orders, or, at the very least—considering its lackluster participation in the consultation process—simply did not care enough about its regulatory and legal obligations to engage the process in a manner that meaningfully contributed to it.

## C. The Environmental Assessments

In its October 12, 2007 Order, this Court ordered the Forest Service to provide the Court with a copy of the 2001 EA "that was suppressed" in order to "evaluat[e] the legitimacy of the documents filed in this case including the current [2006] EA and the DN/FONSI." The Court noted also that it did not know how the 2006 EA differed from the 2001 EA. Responding to the Court's Order, the Forest Service filed the 2001 EA along with Third Declaration of Christopher Wehrli, Declaration of Mark Rey, and Declaration of Thomas Harbour. The Third Declaration of Christopher Wehrli details the differences between the 2001 and 2006 EAs. The Declaration of Mark Rey states that Mr. Rey did not suppress the 2001 EA. Mr. Harbour, in his declaration, explains that the 2001 EA was never signed because it focused on a retardant containing a compound called "YP Soda" and the Forest Service had decided "to halt the use" of retardant containing this compound.

Mr. Wehrli notes that while the 2006 EA "does include some of the same historical information as that contained in the earlier draft regarding the [Forest Service's] use of fire retardant," it is nevertheless "an original product prepared by the ID Team members, which included some resource specialists with expertise in a variety of relevant disciples." He highlights some of the differences between the 2001 and 2006 EAs, pointing to the following:

1. Different Proposed Actions. The 2001 EA focused on the use of retardant under the 2000 Guidelines; the 2006 EA focused on continuing the aerial application of fire retardant to fight fires and to permanently adopt the 2000 Guidelines.

2. Different Alternatives. The 2001 EA did not examine the alternative of not using fire retardant; the 2006 EA examined whether to use fire retardant at all.

3. Different Fire Retardants. The chemical compositions of the retardants considered in each EA are different.

4. Public Participation. The 2001 EA did not include any public participation; the 2006 EA did.

5. Different Effects Analysis. The 2006 EA added an analysis of effects on resources different than those the 2001 EA analyzed.

6. Scientific Information. The 2006 EA used new information and studies.

7. Different Geographic Scope. The 2006 EA was limited to Forest Service lands; the 2001 EA included some Department of Interior lands.

The NMFS's consultation history indicates, however, that as of February, 2007, the Forest Service was insisting to the Services that its consultations with them was limited to the issue of whether it should continue to use the 2000 Guidelines. The record history indicates that it was the Services, and not the Forest Service, that understood that the scope of the proposed action included the use of retardant

generally. And, as noted above, the NMFS's RPAs insist that the Forest Service still needs to conduct standard scientific testing to evaluate the toxicity of fire retardants and their effect on water quality and critical habitat. The differences to which Mr. Harbour points are differences in form. The assertion that any substance underlies these formal differences is dubious at best, for, again, the DN/FONSI incorporates, as justification for its finding that no EIS is needed, the NMFS's RPAs, which in turn suggest strongly that the Forest Service has not complied with the regulatory requirements for preparing an EA.

Put differently, the DN/FONSI states that the alternative adopted (the NMFS's RPAs) "does not require any operational changes to the use of fire retardant. Rather, it involves additional testing and monitoring." However, the extent and scope of the "additional testing and monitoring" the RPAs require make it difficult to conclude that, in the first instance, the Forest Service's EA "provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). If this is the case, the Forest Service has not complied with the law or the Court's orders.

### III. Conclusion and Order

■ Consistent with its apparent strategy to feign compliance with the law while in reality disregarding it, the Forest Service's argument seems tenable at first glance. That is, it argues it complied to the best of its ability with the Court's orders requiring compliance with NEPA and ESA, and reasonably waited for the Services to complete the ESA consultation process before finalizing a decision under NEPA. Upon close inspection of the documents in the record—documents the Forest Service filed—it is clear that the Forest Service has engaged in a course of conduct that is the cause of any delay. The record supports the conclusion that this course of conduct was deliberate. The record provides clear and convincing evidence supporting the conclusion that the Forest Service did not engage in the processes the law and the Court's orders required. The record is bereft of any meaningful effort to meet the deadlines, or to even complete the processes the regulations mandate. At best, the documents show the Forest Service's disregard for its legal and regulatory obligations and for this Court's orders. On the record before the Court, any contrary conclusion is unwarranted.

In its Opposition to Motion for Contempt, the Forest Service stated that "[s]hould this Court," upon reviewing the documents the USFS has filed, "still consider that the question of whether the Agency and/or the Under Secretary should be found in contempt is before the Court, Defendant requests an evidentiary hearing prior to any decision on that issue." (citing *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1324 (9th Cir.1998)) ("a district court ordinarily should not impose contempt sanctions solely on the basis of affidavits"). In its Sur–Reply in Opposition to Motion for Contempt, it makes the same request, again citing *Peterson*, and insists that "[t]he opportunity to present live testimony in lieu of additional declarations is especially warranted given the nature of the sanction being considered."

For the reasons set forth above,

**IT IS HEREBY ORDERED** that the parties shall appear before this Court at a hearing on February 26, 2008, at 1:15 p.m., at which time the United States Forest Service shall be afforded the opportunity to dispel the Court's inclination to hold it in contempt of court for failure to comply with the law and the Court's orders.

**IT IS FURTHER ORDERED** that the parties shall be prepared to address the argument the United States Forest Service has advanced, under the doctrine of factual impossibility as set forth in *United States v. Rylander,* 460 U.S. 752, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983), that it did not comply with the law and the Court's Orders because it was factually impossible to do so. The United States Forest Service shall be allowed the opportunity to offer testimony to meet its burden, consistent with the cases it relies on in its briefs, to provide evidence for this defense, keeping in mind that pursuant to the authority on which the Forest Service relies in its briefs, "the defendant has [the] burden of production ... that may be difficult to meet, particularly in cases such as this where the defendants have a long history of delay and the plaintiffs' needs are urgent." *Badgley,* 800 F.2d at 36.

**IT IS FURTHER ORDERED** that the parties shall be prepared to address the appropriateness and efficacy of the following sanctions the Court is considering:

1. Incarcerating Undersecretary of Agriculture Mark Rey in a correctional facility until the United States Forest Service has met its legal and regulatory obligations and complied with the Court's Orders;

2. Placing Undersecretary of Agriculture Mark Rey under house arrest subject to electronic monitoring until the United States Forest Service has met its legal and regulatory obligations and complied with the Court's Orders; and

3. Enjoining the use of all aerial fire retardants, except water, in all fifty (50) United States until the United States Forest Service has met its

legal and regulatory obligations and complied with the Court's Orders.

