**FOREST SERVICE EMPLOYEES FOR ENVIRONMENTAL ETHICS, Plaintiff,**

v.

**UNITED STATES FOREST SERVICE, United States Fish & Wildlife Service, and National Marine Fisheries Service, Defendants.**

No. CV–08–43–M–DWM.

United States District Court,
D. Montana,
Missoula Division.

July 27, 2010.

Tim Bechtold, Missoula, MT, for Plaintiffs.

Jared S. Pettinato, Mark Brown, Main Justice, Washington, D.C., for Defendants.

## ORDER

### I. Introduction

The Plaintiff in this case, Forest Service Employees for Environmental Ethics, seeks review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, of federal agency actions and the associated planning documents relating to the use of chemical fire retardant to fight wildfires on United States Forest Service lands. Plaintiff's Second Amended Complaint alleges claims under the National Environmental Policy Act ("NEPA") (Count I) and the Endangered Species Act ("ESA") (Counts II–IV). The planning documents challenged are the Forest Service's Environmental Assessment, Decision Notice, and Finding of No Significant Impact; and the Biological Opinions issued by the Fish and Wildlife Service and NOAA's National Marine Fisheries Service ("NOAA Fisheries").[1]

Plaintiff asks the Court to declare that the agencies have violated the relevant statutes and to set aside the challenged documents. Plaintiff seeks injunctive relief compelling the agencies to comply with the law, and also requests an award of reasonable fees, costs, and expenses, including attorney's fees. The case is now resolved on the parties' cross-motions for summary judgment for the reasons set forth below.

### II. Background

#### A. The 2003 Case

This legal dispute originated in a 2003 case in which Plaintiff sued the Forest Service, claiming that the agency should conduct a NEPA analysis and consult with the Fish and Wildlife Service pursuant to ESA § 7 regarding its use of chemical fire retardant. *Forest Service Employees for Environmental Ethics v. United States Forest Service*, 397 F.Supp.2d 1241 (D.Mont.2005) (the "2003 case"). Summary judgment was granted in favor of the Plaintiff on both the NEPA and ESA claims. In its discussion of the agency's failure to comply with NEPA, this Court concluded that "[i]t is probable that substantial questions are raised here as to the environmental impact of the annual dumping of millions of gallons of chemical fire retardant on national forests." 397 F.Supp.2d at 1254. The Court ordered the Forest Service to comply with NEPA, leaving it to the agency to determine whether an environmental impact statement is necessary or an environmental assessment will suffice. In the ESA context, the Court rejected the Forest Service's argument that post-hoc, case-by-case consultation through the regulatory emergency consultation procedure is sufficient to satisfy the requirements of the ESA. The Court ordered the Forest Service to begin formal consultation with the Fish and Wildlife Service. *Id.* at 1257. The Court did not enjoin the continued use of chemical fire retardant.

The Forest Service did not diligently pursue compliance with the judgment. Unable to meet the Court's original deadline for NEPA compliance of August 8, 2007, the Forest Service sought and received an extension until October 10, 2007.

---

1. The Fish and Wildlife Service and NOAA Fisheries are herein referred to collectively as the "ESA agencies."

*Forest Service Employees for Environmental Ethics v. United States Forest Service*, 530 F.Supp.2d 1126, 1127 (D.Mont. 2008). On October 10, 2007, the Forest Service issued an Environmental Assessment (USFS AR 337).[2] *Id.* at 1128. Plaintiff filed a motion for contempt on the same day, arguing the Forest Service had failed to meet the Court's deadline because it had not fully complied with NEPA. *Id.* The agency attempted to moot the contempt motion by hastily filing a Decision Notice and Finding of No Significant Impact on October 11, 2007 (USFS AR 326). *Id.* The Forest Service then sought to justify its untimely compliance by placing the blame on the ESA agencies, claiming it could not complete its analysis and issue a decision notice until formal ESA consultation was complete. *Id.* at 1129–1130.

The Court was not persuaded by the Forest Service's argument, in large part because the record showed that the ESA agencies had not completed consultation due to the Forest Service's incomplete, insincere, and untimely efforts to comply with the law and the Court's orders. 530 F.Supp.2d at 1131–1134.[3] The Court also expressed doubt about the sufficiency of the Forest Service's Environmental Assessment, noting that but for the contrary insistence of the ESA agencies, the Forest Service would have conducted an assessment of only the narrow question of its continued use of the 2000 Guidelines,[4] rather than the proper Court-ordered analysis of the use of retardant generally. *Id.* at 1134–1135.

A contempt hearing was set for February 26, 2008. Eight days before the hearing, on February 18, 2008, the Forest Service issued an amended Decision Notice and Finding of No Significant Impact accepting the reasonable and prudent alternatives established by the ESA agencies. USFS AR 341. The Court held the contempt hearing as scheduled and issued an order afterward in which it denied the motion for contempt on the ground that the contempt power may be used only to coerce compliance with the law and court orders, and may not be used for punitive reasons. Doc. No. 157, CV 03–165–M–DWM. Finding that the Forest Service had complied with the judgment by performing a NEPA analysis and consulting with the ESA agencies, the Court dismissed the 2003 case on March 12, 2008. Doc. No. 160, CV 03–165–M–DWM. Three weeks later, on April 2, 2008, Plaintiffs filed this action challenging the NEPA and ESA documents that resulted from the Forest Service's compliance.

**B. The Forest Service's Use of Chemical Fire Retardant**

The Forest Service has used chemical retardants to fight wildfires on federal

---

**2.** Citations to the Forest Service Administrative Record are in the following format: USFS AR [document number] at [Bates number].

**3.** *See* 530 F.Supp.2d at 1127 ("The Forest Service has, throughout these proceedings, evidenced a strategy of circumventing, rather than complying with, NEPA and ESA."); 1131 ("The record in this case shows the Forest Service had no real intention to comply with the law or the Court's Orders."); 1132–1133 ("The record reveals a pattern of conduct showing the Forest Service either deliberately disregarded the obligations at-

tendant to its role in the consultation process, or performed these obligations only perfunctorily."); 1134 ("A straight reading of the record here indicates that the Forest Service had no intention to comply with the Court's orders, or, at the very least—considering its lackluster participation in the consultation process—simply did not care enough about its regulatory and legal obligations to engage the process in a manner that meaningfully contributed to it.")

**4.** Guidelines for Aerial Delivery of Retardant or Foam near Waterways, USFS AR 131.

lands since at least 1955. USFS AR 337 at 9. Today, fire retardant solutions are 85 percent water, with the remainder consisting mostly of inorganic fertilizer along with thickeners and corrosion inhibitors.[5] *Id.* at 10. Retardant is used primarily in the western part of the country; it is not commonly used in the Northeast or Midwest, and is used periodically in the Southeast. *Id.* at 8.

## C. The Forest Service's ESA Consultation

The Forest Service consulted under the ESA with both the Fish and Wildlife Service and NOAA Fisheries. USFS AR 339 at 1; USFS AR 1075 at 1. The ESA agencies issued programmatic biological opinions, defining the action area as all National Forest System lands (totaling 192 million acres) together with a buffer area surrounding those lands. USFS AR 339 at 10–11; USFS AR 1075 at 17. According to the Fish and Wildlife Service, "[t]he size of this buffer is dependant upon the species in question and the likelihood of said species being exposed to fire retardant when applied on [National Forest System] lands." USFS AR 339 at 11. NOAA Fisheries defined the action area "broadly to encompass lands and waters of the United States with particular emphasis on [Forest Service] lands and adjacent properties." USFS AR 1075 at 17. The ESA agencies assumed that any listed species within the action area could potentially be affected by the use of fire retardant, resulting in a significant number of listed species included in the analyses: 27 species for NOAA Fisheries and 387 species for the Fish and Wildlife Service. USFS AR 1075 at 18–19; USFS AR 339 at 11–20.

### 1. The NOAA Fisheries Biological Opinion

NOAA Fisheries issued its first Biological Opinion on October 9, 2007. USFS AR 338. The agency issued an amended Biological Opinion in June of 2008 to correct typographical errors in the original. USFS AR 827. The agency amended its opinion again to include an analysis for the recently-listed Oregon Coast coho salmon, and issued the currently operative Biological Opinion on July 25, 2008. USFS AR at 1075. The Biological Opinion concludes that the Forest Service's use of fire retardant is likely to jeopardize the continued existence of all 27 listed species examined by NOAA Fisheries, and likely to destroy or adversely modify critical habitat for 23 of those species. *Id.* at 140.

NOAA Fisheries went on to identify a reasonable and prudent alternative that "must be implemented in its entirety" to avoid jeopardy to the 27 listed species and prevent destruction or adverse modification of their habitat. USFS AR 1075 at 141. The reasonable and prudent alternative contains the following provisions:

1. The Forest Service must evaluate the toxicity of two retardant formulations that have not yet been studied, and must similarly evaluate any new formulations, and report the results to NOAA Fisheries within two years.

2. The Forest Service must perform toxicological studies on all currently approved long-term fire retardants to evaluate acute and sub-lethal impacts on fish. The Forest Service must work with NOAA Fisheries to develop a research plan within one year.

---

**5.** Sodium ferrocyanide has been used as a corrosion inhibitor in the past, but has been linked to fish kills resulting from accidental spills and is no longer an ingredient in retardant used by the Forest Service. USFS AR 337 at 10.

3. The Forest Service must develop guidance for on-site assessment of waterways in which retardant is dropped.

4. The Forest Service must implement a policy requiring personnel to report to NOAA Fisheries on all drops in waterways, including information on the amount of retardant dropped, the area affected, whether the drop was accidental or intentional, the expected direct and indirect impacts, and the results of field evaluation of the affected waterway.

5. The Forest Service must provide NOAA Fisheries with a biannual summary of the cumulative impacts of the Forest Service's continued use of fire retardant.

USFS AR 1075 at 141–143.

There is no incidental take statement in the NOAA Fisheries Biological Opinion. The agency explained that uncertainty over where and to what extent retardant will be used made it impossible to supply an incidental take statement:

> The [Forest Service] applies long-term fire retardants in response to emergency circumstances. The goal of this program-level Opinion is to evaluate the impacts to [NOAA Fisheries'] listed resources from the [Forest Service's] broad use of aerially applied fire retardants. Since specific emergency actions and the scope of [the Forest Service's] response to those emergencies cannot be predicted, it is not possible to identify specific take that could occur. Instead, this Opinion anticipates the general effects that would occur from the [Forest Service's] use of aerially applied long-term fire retardants across the landscape. This Opinion does not exempt

incidental take of listed fish or wildlife species from the prohibitions of section 9 of the ESA for the [Forest Service's] use of aerially applied long-term fire retardants.

USFS AR 1075 at 143–144.[6]

NOAA Fisheries goes on to explain that it will authorize take on a case-by-case basis each time the use of fire retardant has the potential to affect listed species. The agency intends for the emergency consultation regulation[7] to be invoked in each such instance. The Biological Opinion states:

> In the event incidental take is anticipated during the emergency response, [NOAA Fisheries'] Regional Office can advise the [Forest Service] of ways to minimize the take. Generally, however, an incidental take statement in an emergency consultation does not include reasonable and prudent measures or terms and conditions to minimize take, except where an agency has an ongoing action related to the emergency. The incidental take statement, however, would document the recommendations given to the [Forest Service] to minimize take during information [sic] consultation, the success of the agency in carrying out these recommendations and the effects of the emergency on the listed resources, and determine whether the emergency action "is not likely to jeopardize the continued existence of a threatened or endangered species or a species proposed for such designation, or is not likely to destroy or adversely modify the critical habitat of such species. [sic]

USFS AR 1075 at 144.

NOAA Fisheries also made a non-binding "conservation recommendation" encouraging the Forest Service to employ

---

**6.** "Long-term" fire retardants are those that continue to retard burning even after their water component has evaporated. USFS AR 339 at 3.

**7.** 50 C.F.R. § 402.05.

flight navigation and guidance technology to avoid misapplication of retardants in waterways. USFS AR 1075 at 144.

### 2. The Fish and Wildlife Service Biological Opinion

The Fish and Wildlife Service issued its Biological Opinion on February 15, 2008. Like NOAA Fisheries, the Fish and Wildlife Service prepared a programmatic Biological Opinion; the analysis covers 387 listed species, and the agency concluded that the proposed action will result in jeopardy and/or destruction or adverse modification of critical habitat for 45 listed species. USFS AR 339 at 1, 11–20. The consultation was coordinated from the agency's Washington, D.C. headquarters, with specialists from each regional office contributing to the analysis for the species on which they have the most expertise.

The Fish and Wildlife Service began its analysis by applying what it calls a "coarse filter" to all 387 listed species. The coarse filter was intended to allow the agency to make a preliminary jeopardy determination for each species. USFS AR 339 at 21. The coarse filter analysis began by breaking the listed species into the following taxonomic groups: plants, invertebrates, fishes, amphibians, reptiles, birds and mammals. *Id.* The agencies then used existing literature to identify subgroups based on heightened vulnerability to exposure to fire retardant. The following subgroups were selected for closer analysis: legumes, aquatic invertebrates, freshwater mussels, terrestrial invertebrates, and ruminants. *Id.*

The Forest Service then considered the potential effects of fire retardant on the groups and subgroups by applying a four-step analysis. First, the agency considered the range and distribution of the species. USFS AR 339 at 21. Well-distribut-

ed species with many populations were deemed at low risk of jeopardy. *Id.* The agency next considered the likelihood that a species would be exposed to fire retardant during a fire. *Id.* The third step asks whether exposure of a species to retardant is likely to result in take. *Id.* at 22. Finally, for those species for which the Fish and Wildlife Service concluded that take may occur, the agency went on to ask whether the amount of take would be likely to jeopardize the continued existence of the species. *Id.* This "coarse filter" analysis yielded a preliminary determination that 181 species were not likely to be jeopardized by the Forest Service's continued use of fire retardant. *Id.* at 11.

The Fish and Wildlife Service sought more detailed analysis of the 206 remaining species from its regional and field offices. USFS AR 339 at 22. The agency also distributed the list of 181 species for which the coarse filter yielded a "no jeopardy" determination, so that its regional and field offices could "ground truth" the coarse filter and conduct more analysis where needed. *Id.* at 22–23. The process resulted in additional analysis for 11 of the 181 species given a preliminary "no jeopardy" finding, together with detailed analysis for all 206 species for which the coarse filter found some potential for jeopardy. *Id.* at 23. The end result was a determination by the Fish and Wildlife Service that the aerial application of fire retardant on federal lands is likely to result in jeopardy or destruction/adverse modification of critical habitat for 45 species, while 342 species are not likely to be jeopardized or to suffer destruction or adverse modification of critical habitat. *Id.* at 23–29, 39–41.

The Fish and Wildlife Service then set forth a reasonable and prudent alternative that, when "added to the action as proposed," [8] is expected to avoid jeopardy and

---

**8.** At the time the Fish and Wildlife Service issued its Biological Opinion, the Forest Service had already incorporated into the

adverse modification to any species. USFS AR 339 at 118–120. The reasonable and prudent alternative requires the Forest Service to develop species-specific measures to be implemented during fire response emergencies. Id. at 119. The measures must include preparation of current maps of the distribution of listed species, prioritization of fuel reduction near critical habitat, guidance encouraging the use of less toxic retardants, and emergency consultation procedures during a wildfire response. Despite the imposition of this reasonable and prudent alternative, the Fish and Wildlife Service makes clear that its Biological Opinion "in no way limits the actions that an incident commander deems necessary to undertake during a fire emergency response." USFS AR 339 at 120.

The Fish and Wildlife Service did not include an incidental take statement in its Biological Opinion. USFS AR 339 at 120. Instead, the agency expects take to be authorized through emergency consultation on a case-by-case basis:

As the [Forest Service] implements their action in each National Forest, the [Forest Service] must work with local Fish and Wildlife Service offices to conduct local level stepped-down consultations to determine the amount or extent of incidental take and to obtain incidental take statements from the Fish and Wildlife Service. . . . Therefore, at minimum, if fire retardant is used in the

vicinity of listed species or critical habitat, the [Forest Service] must conduct consultation under the emergency procedures as stated in the regulations at [50 C.F.R. § 402.05].

Id.

**D. The Forest Service's NEPA Compliance**

The Forest Service prepared an Environmental Assessment analyzing the following proposed action: "The Forest Service proposes to continue the aerial application of chemical fire retardant to fight fires on National Forest system lands and to permanently adopt the Guidelines for Aerial Delivery of Retardant or Foam near Waterways, which were established in 2000." [9] USFS AR 337 at 3. The stated purpose and need for the proposed action is "to allow the Forest Service to maintain the ability to rapidly reduce wildfire intensities and rates of spread until ground forces can safely take suppression action throughout the duration of an incident without harming fish and aquatic habitat." Id. at 8. The Forest Service analysis describes the action area as all National Forest System lands, covering 193 million acres. Id. at 7.

The Forest Service considered two alternatives in detail. Alternative 1 (the "no action" alternative) is to discontinue the aerial application of chemical fire retardant on National Forest lands. USFS AR 337

---

proposed action the reasonable and prudent alternative imposed by the NOAA Fisheries Biological Opinion. USFS AR 339 at 9–10.

9. The 2000 Guidelines require pilots to avoid dropping retardant within 300 feet of waterways, except under the following circumstances:

• Where alternative line construction tactics are not available, the pilot may anchor a foam or retardant line to a waterway, provided the drop is perform using the most

accurate method of delivery (for example, a helicopter rather than a heavy airtanker). USFS AR 131 at 1.

• Retardant may be dropped in or near a waterway "when life of property is threatened and the use of retardant or foam can be reasonably expected to alleviate the threat." Id.

• Retardant may be dropped in or near a waterway "[w]hen potential damage to natural resources outweighs possible loss of aquatic life." Id.

at 15. Alternative 2 is the proposed action, continuing retardant use and adopting the 2000 Guidelines.[10] *Id.* Then–Forest Service Chief Abigail Kimbell issued a Decision Notice and Finding of No Significant Impact adopting Alternative 2 as modified by the inclusion of the reasonable and prudent alternatives imposed by the ESA agencies. USFS AR 341 at 4. In reaching the conclusion that the action would not significantly impact the affected area, the Forest Service relied on the fact that accidental delivery into a waterway is an uncommon occurrence: "Based on the low frequency of 14 accidents over 8 years and approximately 128,000 aerial drops, the likelihood of retardant entering a waterway is small." USFS AR 337 at 23. Because Chief Kimbell concluded that the action "will not have a significant impact on the quality of the human environment considering the context and intensity of impacts," the Forest Service did not undertake a more detailed analysis through the preparation of an environmental impact statement. USFS AR 341 at 11.

### E. Plaintiff's Claims

Count I of the Second Amended Complaint alleges that the Forest Service violated NEPA when it concluded in its Environmental Assessment that the proposed action would not have a significant impact and decided not to prepare an environmental impact statement. Plaintiff also claims that the analysis in the Environmental Assessment does not comply with the requirements of the statute, and that the Forest Service should have developed alternatives to the use of chemical fire retardant.

The remaining counts are brought under the ESA. Counts II and III claim NOAA Fisheries and the Fish and Wildlife Service violated the ESA by failing to include incidental take statements in their biological opinions. In Count IV, Plaintiff alleges the Fish and Wildlife Service's reliance on its reasonable and prudent alternative is arbitrary and capricious because the reasonable and prudent alternative will not prevent jeopardy. Count V alleges that the Fish and Wildlife Service violated the ESA because it did not consider the effects of the action on the value of critical habitat for recovery. Plaintiffs make a series of claims under Count VI, saying the Fish and Wildlife Service violated the ESA by failing to (1) address the effects of related activities; (2) adequately assess the environmental baseline; and (3) consider the aggregate effects of the use of retardant and other human activities.

10. Five other alternatives were examined but not considered in detail:

> **Alternative A:** Allow unrestricted use of retardant. This alternative was not considered because it is contrary to agency policy and the 2000 Guidelines.
> **Alternative B:** No aerial retardant within a quarter-mile of waterways or in wilderness areas, wilderness study areas, and other withdrawn land allocation areas. This alternative was not considered because it would constrain a fire response incident commander's ability to respond quickly and protect private property adjacent to waterways.

> **Alternative C:** Use water only as an aerial retardant. This alternative was not considered because the Forest Service viewed it as part of the "no action" alternative.
> **Alternative D:** Allow retardant only where benefits "far outweigh" risks. This alternative was not considered because incident commanders already take risks into account when using retardant and because it is too subjective to be effectively analyzed.
> **Alternative E:** Stop using retardant until a less toxic product is developed. This alternative was not considered because the Forest Service viewed it as part of the "no action" alternative.
> USFS AR 337 at 17–18.

## III. Analysis

### A. Legal Standards Applicable to All Claims

#### 1. Standard of APA Review

Agency decisions may be set aside under the APA only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (quoting 5 U.S.C. § 706(2)(A), overruled on other grounds by *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). Agency action can be set aside "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Alvarado Community Hospital v. Shalala*, 155 F.3d 1115, 1122 (9th Cir.1998). The court must ask "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment ... [The court] also must determine whether the [agency] articulated a rational connection between the facts found and the choice made. [The] review must not rubber-stamp ... administrative decisions that [the court deems] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocates v. U.S. Army Corps of Engineers*, 361 F.3d 1108, 1119 (9th Cir.2004) (internal citations and quotations omitted).

#### 2. Summary Judgment Standard

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *see also, Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is particularly applicable to cases involving judicial review of final agency action. *Occidental Engineering Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985) (citation omitted). Summary judgment is appropriate in this case because the issues presented address the legality of the Federal Defendants' actions based on the administrative record and do not require resolution of factual disputes.

### B. NEPA (Count I)

#### 1. Legal Standard

NEPA is intended to focus the attention of the government and the public on the likely environmental consequences of a proposed agency action. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). The Act "places on the agency the obligation to consider every significant aspect of the environmental impact of the proposed action" and "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (citations omitted).

NEPA imposes procedural obligations on government agencies. "NEPA does not work by mandating that agencies achieve particular substantive environmental results." *Marsh*, 490 U.S. at 371, 109 S.Ct. 1851. NEPA dictates the necessary procedure an agency must follow, but does not state any requirements relating to the outcome of the agency's decision making process. *Robertson v. Methow Valley Cit-*

*izens Council,* 490 U.S. 332, 359, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

■ NEPA requires a federal agency to prepare an environmental impact statement detailing the environmental impacts of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This obligation includes the duty to consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). "If several actions have a cumulative environmental effect, 'this consequence must be considered in an [environmental impact statement].' " *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1214 (9th Cir.1998) (quoting *Neighbors of Cuddy Mountain v. United States Forest Service,* 137 F.3d 1372, 1378 (9th Cir.1998)). To assist in determining whether an environmental impact statement is necessary, an agency may prepare an environmental assessment. 40 C.F.R. § 1508.9. An environmental assessment is a less detailed analysis that includes a brief discussion of the need for the proposal, the alternatives under consideration, the environmental impacts of the proposed action and alternatives, and a listing if the agencies and individuals consulted. 40 C.F.R. § 1508.9(b). If the environmental assessment shows that the proposal will not have a ·significant impact, the agency may issue a finding of no significant impact under 40 C.F.R. § 1508.13. If the agency determines that the proposed action will significantly impact the environment, it must go on to prepare an environmental impact statement. 42 U.S.C. § 4332(2)(C).

■ The environmental impact statement must describe the environmental impacts of the proposed agency action, any adverse environmental impacts of the proposed action that cannot be avoided, and alternatives to the proposed action which were considered by the agency. *Robertson,* 490 U.S. at 349, 109 S.Ct. 1835. The scope and nature of the direct, indirect, and cumulative impacts analysis is a matter committed to the sound discretion of the agency. *Kleppe v. Sierra Club,* 427 U.S. 390, 413–14, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). If the nature and scope of the analysis is challenged, the reviewing court may only examine whether "the agency has taken a 'hard look' at the environmental consequences." *Inland Empire Public Lands Council v. U.S. Forest Service,* 88 F.3d 754, 763 (9th Cir.1996) (quoting *Kleppe,* 427 U.S. at 410 n. 21, 96 S.Ct. 2718). A court may not interject itself within the area of discretion of the executive as to the choice of the action to be taken; only if the agency's analysis of the environmental impact is "arbitrary and capricious" or "contrary to the procedures required by law" can the reviewing court conclude that the agency did not take the requisite "hard look." *Kleppe,* 427 U.S. at 410 n. 21, 96 S.Ct. 2718; *Inland Empire,* 88 F.3d at 763.

### 2. Plaintiff's NEPA Arguments

Plaintiff makes three arguments in support of the NEPA claim.[11] First, Plaintiff challenges the scope of the Forest Service's analysis. Plaintiff maintains that for the agency to fully examine the indirect and cumulative impacts of the proposal and any connected actions, the Forest Service must prepare an analysis of the impact of *all* fire suppression activity on federal lands, and may not confine its analysis to the use of aerially applied fire retardant. Plaintiff also challenges the adequa-

---

**11.** Plaintiff chose not to argue its NEPA claim for failure to consider alternatives to the use of fire retardant, and so has abandoned that claim. *Self Directed Placement Corp. v. Control Data Corp.,* 908 F.2d 462, 467 (9th Cir. 1990).

cy of the analysis in the environmental impact statement, saying the Forest Service failed to sufficiently evaluate the effects of the proposed action on fish and water quality and failed to discuss how the reasonable and prudent alternatives will mitigate the harm to listed fish and plants. Plaintiff's final argument in support of the NEPA claim argues that the Forest Service erred in its finding that the proposed action will not have a significant impact on the environment, and that the Forest Service should have proceeded to analyze the proposal in greater detail in an environmental impact statement.

### a. The Scope of the Forest Service's NEPA Analysis

A common thread running through Plaintiff's NEPA and ESA arguments is the Plaintiff's insistence that the proper scope of analysis is not confined to the Forest Service's use of fire retardant, but should extend to the effects of fire suppression generally on National Forest System lands. Here Plaintiff expresses that view in the context of arguments that the Forest Service failed to analyze the indirect effects of fire retardant use and failed to analyze significant impacts of cumulative and connected actions.

#### i. Indirect Effects

■ Indirect effects are "caused by the action and are later in time or farther removed in the distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). Plaintiff argues that the use of aerial fire retardant results in smaller fires, "mean[ing] that fire's natural role in forest ecosystems is diminished or even eliminated." Pl.'s Resp. Br. (Doc. No. 36) at 5. According to Plaintiff, the Forest Service should have analyzed fire's diminished role in the ecosystem as an indirect effect of the action. This contention is supported by reference to a private 1994 study commissioned by the Forest Service assessing the comparative risks posed by uncontrolled wildfires and the use of chemical fire retardant, USFS AR 194.

Plaintiff focuses on a single sentence in the study's section on "Evaluation of Relative Risks," in which the authors write, "Data accumulated over the past few decades have shown that continual fire suppression may have more adverse effects to ecosystems than wildfires." USFS AR 194 at 23. Plaintiff's emphasis is misplaced because as the Defendants point out, the study speaks of the effects of fire suppression generally, not the use of fire retardant in particular. Moreover, Plaintiff overlooks the statement in the next paragraph that "[f]ire suppression chemicals may, in fact, leave less permanent effects on an ecosystem than some physical fire suppression activities[.]" *Id.* At best, Plaintiff can point to a single statement that fire suppression *may* be more harmful than wildfires, which does not translate into a conclusion that the use of fire retardant alone causes harmful indirect effects in the form of less fire. This Court did not require—and the Forest Service did not perform—an analysis of the agency's fire suppression practices generally. Plaintiff wants an analysis of an effect without any evidence that it is caused by the proposed action. NEPA imposes no such requirement. The Defendants are entitled to summary judgment on this point.

#### ii. Cumulative Impacts of Connected Actions

■ An agency must consider an action's cumulative impact, which is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions[.]" 40 C.F.R. § 1508.7. In assessing impacts an agency is required to take into account connected actions, which are "closely related" to the proposed action.

Connected actions include "independent parts of a larger action [that] depend on the larger action for justification." 40 C.F.R. § 1508.25(a)(1)(iii). Plaintiff argues that the use of fire retardant should be considered as a connected action together with every other activity associated with fire suppression, and that the cumulative impact of all activities comprising the Forest Service's fire suppression regime must be considered together in the NEPA analysis.

The Defendants concede that the Forest Service did not analyze the effects of fire suppression activity generally, but argue the agency has "considerable discretion" in determining the proper scope of its NEPA analysis. *Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir.1985). The Ninth Circuit uses an "independent utility" test for deciding whether actions are connected for the purpose of NEPA review. *Earth Island Institute v. United States Forest Service*, 351 F.3d 1291, 1305 (9th Cir.2003). Each side claims support for its position in the Ninth Circuit's discussion of the test in *Northwest Resource Information Center v. National Marine Fisheries Service*, 56 F.3d 1060 (9th Cir.1995).

*Northwest Resource* involved a challenge to an agency decision relating to the operation of dams, reservoirs, and other structures in the Federal Columbia River Power System. At the time the Army Corps of Engineers relied on three major tactics to help juvenile salmon migrate through the system: river flow improvement, spill control, and surface transportation of fish past the dams. 56 F.3d at 1063. In response to the ESA listing of salmon species, the Corps issued an environmental impact statement on the effects of its plan to improve river flow to benefit the fish. *Id.* at 1065. The environmental impact statement assumed the transportation program would continue and did not address the transportation program or its effects in the analysis. *Id.* The plaintiffs then challenged the document, arguing that the failure to address the transportation program in the analysis violated NEPA because the transportation program and the river flow improvement program were connected actions.

In reaching its conclusion, the court in *Northwest Resource* considered a series of Ninth Circuit cases. The discussion includes elements favorable to each party's position in this case. The first case cited is *Thomas*, in which the court held that a logging project and a road to provide access to the timber were connected actions because "the timber sales cannot proceed without the road, and the road would not be built but for the contemplated timber." 56 F.3d at 1068 (quoting *Thomas*, 753 F.2d at 758). Next the court discussed *Sylvester v. U.S. Army Corps of Engineers*, 884 F.2d 394 (9th Cir.1989), where the court held that a golf course and the accompanying proposed resort were not connected actions under NEPA because "each could exist without the other, although each would benefit from the other's presence." 56 F.3d at 1068 (quoting *Sylvester*, 884 F.2d at 400). The *Sylvester* court explained that while the road and logging project in *Thomas* were "links in the same bit of chain," the golf course and resort were "separate segment[s] of chain." 884 F.2d at 400.

The *Northwest Resource* court then went on to consider *Trout Unlimited v. Morton*, 509 F.2d 1276, 1285 (9th Cir. 1974), in which a dam and reservoir project and a subsequent phase involving disposition of the reservoir's irrigation capacity were found not to be connected actions. The *Trout Unlimited* court explained that a subsequent phase of development is a connected action only when "[t]he dependency is such that it would be irrational, or at least unwise, to undertake the first

phase if subsequent phases were not also undertaken." 509 F.2d at 1285. The final case mentioned is *Daly v. Volpe,* 514 F.2d 1106 (9th Cir.1975), where the court held that the impact of one segment of a larger highway project could be considered apart from the rest of the highway because the segment had independent utility.

After considering these cases, the *Northwest Resource* court concluded that the transportation program and the river flow improvement program were not connected actions. 56 F.3d at 1068. The court analogized the case to *Sylvester* and *Daly,* stating, "The Corps would continue the transportation program with or without flow improvements. And, the Corps would explore flow improvements with or without the transportation program." *Id.* Plaintiff seizes upon that language as compelling a finding of connectedness here, because while fire suppression could exist without fire retardant, fire retardant would not exist without fire suppression. Quoting *Trout Unlimited,* Plaintiff contends it would be "irrational, or at least unwise," to use fire retardant unless the "subsequent" step of ground force fire suppression actions were not also undertaken. Plaintiff tries to cast the issues in the light most favorable to its position by suggesting that the two actions up for consideration are the use of fire retardant on one hand and fire suppression generally on the other. Framing the issue in that way allows the Plaintiff to argue that fire retardant would not exist without fire suppression.

The trouble with Plaintiff's argument is that the "other firefighting actions" to which Plaintiff refers are not a single action that can be lumped under the heading "fire suppression." The Forest Service's policy of suppressing wildfire is comprised of a series of actions, including ground crews, hand tools, water trucks, bulldozers, helitack crews, smokejumpers, and fire re-

tardant, among others. Although these actions are all related to each other, none of them individually is contingent on the existence of any of the others. The closing paragraph of the court's analysis in *Northwest Resources* is on point:

> [W]e cannot agree ... that the transportation program and the flow improvement measures are so interdependent as parts of the larger action of improving the survival of the salmon that they must be addressed in the same NEPA document. On this rationale, measures involving harvest limits, hatchery releases, and habitat maintenance are also interdependent parts of every action taken to benefit the salmon. While we cannot allow an agency to segregate its actions in order to support a contention of minimal environmental impact, we also cannot force an agency to aggregate diverse actions to the point where problems must be tackled from every angle at once.

56 F.3d at 1069 (citation omitted).

Just as river flow improvement is one of many actions taken to benefit salmon, fire retardant is one of many tactics used to fight wildfires. The Forest Service is not required to treat fire retardant and other firefighting tactics as connected actions. This conclusion is consistent with the ruling in the 2003 case, which directed the Forest Service to prepare a NEPA analysis of the agency's use of fire retardant, not the agency's broader policy of fire suppression. If the Forest Service had analyzed all fire suppression tactics as connected actions, the scope of the NEPA discussion would have swallowed the issue of fire retardant and mandated, among other things, consideration of a "no action" alternative consisting of the cessation of all fire suppression activities on federal lands. That is not the NEPA analysis that was ordered or that the law requires. The

scope of the Environmental Assessment is adequate. The Federal Defendants are entitled to summary judgment on this point.

### b. Adequacy of the Forest Service's Analysis

Plaintiff's next argument challenges the adequacy of the Forest Service's NEPA analysis. Here Plaintiff argues that the Forest Service's analysis is inadequate even under the lower standards of what must be included in an Environmental Assessment. This argument challenges the depth of the Environmental Assessment's analysis, while the next section deals with Plaintiff's closely related contention that Forest Service's finding of no significant impact was arbitrary and capricious, and that the agency should prepare an environmental impact statement.[12] Plaintiff contends the Forest Service failed to adequately evaluate the effects on the action on fish and plants, and failed to evaluate the mitigation measures (reasonable and prudent alternatives).

### i. Analysis of the Effect on Fish

■ The discussion of the effects on fish is inadequate, Plaintiff argues, because the Forest Service's NEPA documents ignore the fact that drops in waterways will continue to occur and have significant adverse consequences. The Forest Service discusses the effects of fire retardant drops on fish and aquatic habitat in the Environmental Assessment. USFS AR 337 at 20–24. The analysis recognizes risks to fish from retardant drops, describes the factors affecting mortality, recites the provisions of the 2000 Guidelines

intended to limit drops in waterways, and provides data indicating that drops in waterways in infrequent relative to the total number of drops ("14 accidents over 8 years"). *Id.* The discussion is brief, but the regulations require nothing more. 40 C.F.R. § 1508.9. The Forest Service's discussion of the effects on fish is adequate.

### ii. Analysis of the Effect on Plants

■ The Environmental Assessment contains much less discussion of the effects of the action on listed plants. The Environmental Assessment's analysis of the effects on vegetation amounts to a few sentences, and contains no discussion of the risk of invasion by non-native species that the Fish and Wildlife Service concluded is the greatest risk to listed plants from exposure to fire retardant. USFS AR 337 at 25. The Defendants say that the discussion is contained elsewhere in the record, pointing to the Biological Opinion by the Fish and Wildlife Service and the Finding of No Significant Impact. Relying on *Environmental Protection Information Center v. United States Forest Service*, 451 F.3d 1005 (9th Cir.2006) ("*EPIC*"), the Defendants argue it is permissible for it to incorporate the Biological Opinion's analysis of the effects on listed plants.

In *EPIC*, the plaintiff challenged the Forest Service's decision not prepare an environmental impact statement, arguing that the agency improperly relied on a "no jeopardy" finding from the biological opinion. 451 F.3d at 1012. The court held that while NEPA and the ESA have different standards, the Forest Service is not required to disregard the findings of a

---

**12.** Plaintiff's NEPA arguments are not clearly delineated in the briefing. Plaintiff raises interwoven points attacking the decision not to prepare an environmental impact statement, the adequacy of the analysis in the Environmental Assessment, and the scope of the Forest Service's NEPA analysis. Although this analysis attempts to undertake a distinct consideration of Plaintiff's claim that the Environmental Assessment's analysis is inadequate, there are aspects of the claim that amount to little more than a restatement of the arguments related to the agency's failure to prepare an environmental impact statement.

biological opinion. *Id.* The court went on to observe that the Forest Service did not rely solely on the "no jeopardy" finding, but on "all of the analysis in the [biological opinion], as well as numerous other sources of information," in making its finding of no significant impact. *Id.*

*EPIC* stands for the proposition that an action agency may consider the analysis contained in the biological opinion, as well as other information in the record, in reaching its decision. Nonetheless, Plaintiff correctly observes that EPIC does not allow an action agency to completely ignore an issue in its NEPA documents so long as the matter is discussed in adequate detail in a biological opinion, but that is not the situation here. The Forest Service incorporated by reference into its Decision Notice and Finding of No Significant Impact the analysis contained in the Fish and Wildlife Service's Biological Opinion. USFS AR 341 at 2. It also included the full text of the reasonable and prudent alternative. *Id.* at 6–7. Finally, in recognition of the Biological Opinion's finding that invasion by non-native species is the greatest risk to listed plants from exposure to retardant, the Forest Service discussed that concern in the Decision Notice Finding of No Significant Impact. The agency briefly discusses the preliminary findings of a study of vegetative change following retardant drops on Mount Jumbo, noting "an increase in invasive species," and states that the findings are consistent with two other studies considered in the preparation of the Environmental Assessment. *Id.* at 10. The Forest Service then summarize its mitigation plan, including monitoring and non-native species removal. *Id.*

The Forest Service's discussion of the effects on listed plants is brief but adequate. The record contains a sufficient analysis of the effects on listed plants in the Fish and Wildlife Service Biological Opinion, and the Forest Service acknowledges, incorporates, and briefly expands upon that analysis in its NEPA documents. The discussion contained in the NEPA documents is not extensive, but there is sufficient reference to the issues at hand and the places in the record where a more detailed discussion can be found. The discussion adequately meets the less exacting standards of an environmental assessment.

### iii. Analysis of the Reasonable and Prudent Alternatives

Plaintiff argues that the Forest Service failed to adequately analyze the effectiveness of the reasonable and prudent alternatives in its NEPA documents. It criticizes the Forest Service for providing a "mere listing of mitigation measures, without supporting analytical data," which the court in *National Parks and Conservation Association v. Babbitt,* 241 F.3d 722, 734 (9th Cir.2001), held is not sufficient to support a finding of no significant impact. The point does not advance the Plaintiff's position because there was no biological opinion in *National Parks,* and thus no other place to go to find the required analysis. Here, the Forest Service explicitly relies on the biological opinions and the analyses contained therein. USFS AR 341 at 2. The fact that the Forest Service did not include a detailed analysis of the effectiveness of the reasonable and prudent alternatives in its NEPA documents does not necessarily mean that the agency failed to sufficiently analyze the problem.[13]

---

**13.** The same reasoning undermines Plaintiff's reliance on *Center for Biological Diversity v. National Highway Traffic Safety Administration,* 538 F.3d 1172 (9th Cir.2008). Plaintiff cites *Center for Biological Diversity* because the court in that case held that the Forest Service acted arbitrarily and capriciously in issuing an environmental assessment and finding of no significant impact that contained only conclusory statement unaccompanied by supporting data. As in *National Parks,* there was no biological opinion in *Center for Biological Diversity.*

Plaintiff's briefing suggests that its concerns over the adequacy of the discussion of the reasonable and prudent alternatives are indistinguishable from its argument that the proposed action will have significant impacts that are not alleviated by the reasonable and prudent alternatives. Plaintiff writes:

> The problem is that no where—not in the [Environmental Assessment], not in the [Finding of No Significant Impact], not in the [administrative record]—does the Forest Service analyze the use of aerial fire retardant pursuant to the [reasonable and prudent alternatives], i.e., "in place," as required by *EPIC.*[14] For example, the Forest Service asserts that "maps will give incident commanders an effective tool to implement fire suppression tactics that will better protect [listed plants]." FS SJ at 4. But the [administrative record] includes no maps, thus neither the [Forest Service] (nor anyone else) can judge their accuracy. The [Forest Service] has not assessed how faithfully incident commanders use the maps during fire fighting. The [Forest Service] claims mitigation "by prioritizing lands with [listed plants] for fuel reductions, **when practical** . . ." FS SJ at 4 (emphasis added). What lands? What fuel reduction practices? What effects will the fuel reduction practices themselves have upon the threatened and endangered plans [sic]? When is it "practical" to carry out these practices, and when not? These basic questions remain unanswered. The [Forest Service] claims it will use "water or less toxic fire retardants, **when practical** . . ." FS SJ at 4 (emphasis added).

When? Where? How much? And what constitutes "practical"?

Pl.'s Resp. Br. (Doc. No. 36) at 4–5.

These are questions that would be answered by the more detailed analysis that comes with an environmental impact statement. Plaintiff's argument has as much to do with whether the reasonable and prudent alternatives will effectively mitigate as it does with whether they are adequately discussed. The issue is the same whether it is cast in terms of the Forest Service's alleged failure to take a hard look at the reasonable and prudent alternatives, or in terms of the agency's alleged failure to prepare an environmental impact significant to analyze impacts that Plaintiff believes will not be alleviated by the reasonable and prudent alternatives. For that reason, the claim analysis must proceed to the Plaintiff's next argument, and to consideration of whether the Forest Service's decision not to prepare an environmental impact statement is arbitrary and capricious.

### c. The Forest Service's Decision Not to Prepare an Environmental Impact Statement

 In reviewing an action agency's decision not to prepare an environmental impact statement, a reviewing court focuses on the reasonableness of the agency's conclusion that the action will have no significant adverse impact on the environment. *Save the Yaak Committee v. Block,* 840 F.2d 714, 717 (9th Cir.1988). "If substantial questions are raised regarding whether the proposed action *may* have a significant effect upon the human environment, a decision not to prepare an [environmental impact statement] is unreasonable." *Id.* The decision not to prepare

---

**14.** In *EPIC,* the court found an environmental assessment's discussion of mitigation measures to be adequate where the proposal "incorporate[d] mitigation measures throughout the plan of action, so that the effects are analyzed with those measures in place." 451 F.3d at 1015.

an environmental impact statement must be explained in "a convincing statement of reasons why potential effects are insignificant." *Id.* (quoting the *Steamboaters v. FERC*, 759 F.2d 1382, 1393 (9th Cir.1985)). An agency's statement of the reasons for its decision informs the court's consideration of whether the agency took the requisite "hard look." *Id.*

Whether a proposed action will have a significant impact on the environment requires consideration of the action's context and intensity. *Native Ecosystems Council v. United States Forest Service*, 428 F.3d 1233, 1239 (9th Cir.2005); 40 C.F.R. § 1508.27. An action's intensity is evaluated based on ten factors, only one of which is clearly invoked in the Plaintiff's briefing, i.e., "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973." 40 C.F.R. § 1508.27(b)(9).[15] Any one of the ten factors standing alone may be sufficient to require preparation of an environmental impact statement. *National Parks*, 241 F.3d at 731.

■■■ Plaintiff insists the Forest Service should have prepared an environmental impact statement because the proposed action will have significant effects on listed fish and listed plants. The argument on this point is that the Forest Service's Finding of No Significant Impact cannot be reconciled with the determinations of the Fish and Wildlife Service and NOAA Fisheries that the proposal is likely to jeopardize several dozen listed species; it is impossible, Plaintiff argues, for an action to jeopardize the continued existence of many listed species while not impacting the environment in any significant way.

With respect to fish, Plaintiff points to several places in the Fish and Wildlife Service and NOAA Fisheries Biological Opinions discussing the potential harmful effects on fish and water quality resulting from the introduction of fire retardant into waterways. The Fish and Wildlife Service discusses the effects in its Biological Opinion at USFS AR 339 at 32 (stating that "accidental delivery into a waterway has the highest potential for adverse effects to aquatic organisms," and citing a study's finding that "an accidental spill in a waterway would lead to substantial mortality"); USFS AR 339 at 36 ("Entry of ammonia into waterways containing [immobile invertebrates such as mussels] could have a severe effect."); and USFS AR 339 at 89 ("Direct mortality of listed fish is anticipated, as well as sub-lethal physiological responses that effect survival (harass). The fire retardants are likely to kill macroinvertebrate food items ... resulting in significant habitat degradation that affects breeding and foraging (harm)."); USFS AR 339 at 107 ("The hardest to measure and potentially most significant effects of fire retardant could be long-term, sub-lethal impacts to fish.").

The Biological Opinion from NOAA Fisheries contains similar statements at USFS AR 1075 at 127 (discussing a study's finding that "fire retardant misapplications have biologically significant effects to fish communities"); and USFS AR 1075 at 132 ("The hardest to measure, and potentially most significant effects of fire retardant misapplication could be the sub-lethal impacts to fish and the duration of the im-

---

**15.** Plaintiff does not make specific reference to 40 C.F.R. § 1508.27(b)(9), or to any of the other ten factors set forth in § 1508.27(b). It is clear from Plaintiff's briefing, however, that its claim that the Forest Service should have prepared an environmental impact statement is based on the potential for negative effects on listed species as determined by the ESA agencies in their biological opinions.

pacts to critical habitat."). In discussing the heightened vulnerability of fish during certain life stages, the Forest Service stated in its Biological Evaluation, "Accidental introduction of these chemicals into an aquatic system during a salmonid swim-up period could cause significant mortality and be catastrophic to a local population, especially if that population were threatened or endangered[.]" USFS AR 222 at 9.

Plaintiff has identified similar language in the record indicating that the proposal is likely to harm certain plant species. Among those species are the Mariposa Pussy–Paws *(C. pulchellum)*, for which the Fish and Wildlife Service's Biological Opinion issued a jeopardy finding, stating, "The proposed action would lead to a substantial reduction in the number of *C. pulchellum,* a substantial reduction in range by removing this site as suitable habitat for *C. pulchellum,* and it would preclude the recovery of *C. pulchellum.*" USFS AR 339 at 44. Similar conclusions appear in the Fish and Wildlife Service's Biological Opinion at USFS AR 339 at 45 (stating that a single retardant drop on the Slender-horned Spineflower could cause a non-native species invasion that "would represent an appreciable reduction in the distribution of this species"); USFS AR 339 at 46 (a retardant drop on the California Dandelion could result in a non-native species invasion that is likely to "adversely

modify or destroy critical habitat"); USFS AR at 47 ("a fire retardant drop that promotes non-native plant species could result in significant effects" on Munz's Onion); USFS AR 339 at 48–49 (same risk of significant effects from non-native invasion to seven listed plant species). The Fish and Wildlife Service concluded that the proposed action was likely to jeopardize each of these plant species. USFS AR 339 at 39–41.

Defendants accuse the Plaintiff of "cherry pick[ing]" information in the record to support its position, a practice the court in *Native Ecosystems* found insufficient to demonstrate the type of significant impact that requires an environmental impact statement. 428 F.3d at 1240. Defendants say the mere suggestion in the record of some negative effects on listed species is not evidence of a significant impact, citing *EPIC,* 451 F.3d at 1010. In *EPIC* the court explained that NEPA directs an agency to "consider the degree of adverse effect on a species, not the impact on individuals of that species." *Id.*[16]

The Defendants' reliance on *EPIC* and *Native Ecosystems* ignores a critical distinction, which is that the biological opinions in this case contain jeopardy findings for many fish and plant species. This is not a case like *EPIC,* in which the Fish and Wildlife Service made a "no jeopardy" finding, 451 F.3d at 1012; nor is this case

---

**16.** The Defendants also attempt to rely upon the Forest Service's inability to predict the location and severity of future wildfires to justify the Forest Service's decision not to prepare an environmental impact statement. Defendants cite *Ocean Advocates v. United States Army Corps of Engineers,* 402 F.3d 846, 870 (9th Cir.2005), for the proposition that an environmental impact statement is not required unless further data collection will resolve the uncertainty. Since no amount of further study will yield reliable predictions about where retardant will be used in the future, the Forest Service argues, it is not

required to study the matter in greater detail. The citation is inapposite here, as *Ocean Advocates* was a case in which the plaintiff raised questions about the "uncertainty" factor, 40 C.F.R. § 1508.27(b)(5). The factor at issue here is § 1508.27(b)(9), requiring consideration of the degree of adverse effects on listed species and critical habitat. Plaintiff is not arguing that the project's effects are uncertain; to the contrary, Plaintiff contends that the jeopardy findings of the ESA agencies show that the proposed action is certain to have significant harmful effects on listed plants and fish and their habitat.

like *Native Ecosystems*, which did not involve any species listed under the ESA and therefore has no application to a claim under § 1508.27(b)(9). 428 F.3d at 1236 n. 4. Here, the ESA agencies found that jeopardy and/or adverse modification are likely to occur, and then issued reasonable and prudent alternatives that will, in the judgment of the agencies, alleviate those harms. Thus, in the context of the particular factor invoked by the Plaintiff, the question for the Court is whether the Forest Service has provided a convincing statement of reasons that adequately explains its finding that the reasonable and prudent alternatives will prevent the action from having a significant adverse impact on listed species or critical habitat.

To the Plaintiff, the ESA agencies' findings that the proposed action is likely to jeopardize listed fish and plants leave the Forest Service no discretion; an environmental impact statement must be prepared. The Defendants disagree, arguing that the ESA agencies' jeopardy/adverse modification findings do not compel preparation of an environmental impact statement because (1) the likelihood of a drop in a waterway is very low and (2) the Forest Service incorporated the reasonable and prudent alternatives required by the ESA agencies, which are intended to alleviate the risk of jeopardy or adverse modification.

The Forest Service's explanation for its decision not to prepare an environmental impact statement is contained in the Decision Notice and Finding of No Significant Impact, USFS AR 341. With regard to the effects on listed species, the Forest Service stated:

The decision should not jeopardize the continued existence of any endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species act of 1973. The aerial application of fire retardant will conform to the [2000 Guidelines] and the reasonable and prudent alternatives from [the ESA agencies'] biological opinions. The [ESA agencies'] biological opinions affirm that by incorporating the reasonable and prudent alternatives into the final decision, the alternative action will avoid the likelihood of jeopardizing the continued existence of listed species or destroying or adversely modifying critical habitat.

USFS AR 341 at 12. The Decision Notice and Finding of No Significant Impact also contains a recitation of the reasonable and prudent alternatives imposed by the ESA agencies and incorporated into the decision. *Id.* at 4–9. In the Environmental Assessment, the Forest Service explained that the likelihood of fire retardant affecting aquatic species is "small" due to "the low frequency of 14 accidents over 8 years and approximately 128,000 aerial drops." USFS AR 337 at 23.[17]

 It is not difficult to discern the Forest Service's reasoning; the agency relies almost entirely on the analyses in the biological opinions and the expected success of the reasonable and prudent alternatives in concluding that the proposed action is not likely to have a significant impact on listed species. The adoption of mitigation measures can in some instances justify an agency's decision not to prepare an environmental impact statement, but only where the measures "constitute an

17. Despite its finding regarding the low likelihood that fire retardant will enter a waterway, the Forest Service determined that the very possibility that retardant could enter a waterway containing a listed species warrant-ed a "likely to adversely affect" determination at the "programmatic level," thus triggering formal ESA consultation. USFS AR 337 at 23.

adequate buffer against the negative impacts that may result from the authorized activity." *National Parks,* 241 F.3d at 733–734.

The reasonable prudent alternatives issued in this case do not provide the requisite buffer. Both ESA agencies issued mitigation measures that place no meaningful restrictions on the decisions of incident commanders, despite the agencies' conclusions that such decisions involving fire retardant can have disastrous effects on listed species. *See* USFS AR 339 at 120 (Fish and Wildlife Service making clear that its Biological Opinion "in no way limits the actions that an incident commander deems necessary to undertake during a fire emergency response"); USFS AR 1075 at 141–143 (listing of the provisions of NOAA Fisheries' reasonable prudent alternative contains no restrictions on retardant use). By failing to impose any binding restrictions on the use of fire retardant where it may affect listed species or critical habitat, the ESA agencies have failed to alleviate the risk of jeopardy to listed species. It therefore remains likely that the action will "adversely affect an endangered or threatened species or its habitat that has been determined to be critical," 40 C.F.R. § 1508.27(b)(9), and the adverse effect will be of such a severe degree that jeopardy or adverse modification is likely to occur for some species. These are significant impacts that require the preparation of an environmental impact statement, and the Forest Service's failure to prepare one under these circumstances is a violation of NEPA.

The Plaintiff is entitled to summary judgment on Count I, the NEPA claim, because the jeopardy findings of the ESA agencies constitute significant impacts that are not alleviated by the reasonable and prudent alternative, requiring the preparation of an environmental impact statement.[18] The Forest Service's finding on this issue is set aside and the Environmental Assessment is reminded to the agency for further proceedings consistent with the law.

## C. ESA (Counts II–VI)

### 1. Legal Standard

Section 7(a)(2) of the Endangered Species Act requires federal agencies to consult with the Fish and Wildlife Service or the NOAA Fisheries Service to ensure that any action authorized, funded or carried out by the agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in destruction or adverse modification of critical habitat for such species.[19] 16 U.S.C. § 1536(a)(2). The statute and its implementing regulations establish a framework for assessing the impacts of a proposed activity on listed species. 16 U.S.C. § 1536; 50 C.F.R. Part 402.

An agency proposing an action must first determine whether the action "may affect" species listed as endangered or threatened under the ESA. 50 C.F.R. § 402.14(a). If the agency determines that the proposed action may affect listed species, formal consultation with the Fish and Wildlife Service is required except in

18. The shortcomings of the Fish and Wildlife Service's reasonable and prudent alternative are discussed in detail in the ESA section.

19. The ESA defines "critical habitat" in part as:

the specific areas within the geographical area occupied by the species, at the time it

is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection[.]
16 U.S.C. § 1532(5)(A)(i).

certain instances. *Id.* The relevant exceptions allow an action agency to forego formal consultation

if, as a result of the preparation of a biological assessment under § 402.12 [20] or as a result of informal consultation with the Service under § 402.13,[21] the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat.

50 C.F.R. § 402.14(b)(1).

 Formal consultation means the Fish and Wildlife Service must prepare a biological opinion in which the Service advises a federal agency as to whether the proposed action, whether alone or cumulatively with other actions, is likely to jeopardize the continued existence of [22] any listed species or is likely to result in the destruction or adverse modification of any critical habitat. 50 C.F.R. § 402.14(h)(3). In its biological opinion, the Fish and Wildlife Service "must state a rational connection between the facts found and the decision made." *Gifford Pinchot Task Force v. United States Fish and Wildlife Service,* 378 F.3d 1059, 1065 (9th Cir.2004) ("*Gifford Pinchot*"). If the Fish and Wildlife Service determines that a proposed action is likely to result in jeopardy or loss of critical habitat, the Service must set forth reasonable and prudent alternatives to the action, if any. 16 U.S.C. § 1536(b)(3)(A). If the Service determines that a proposed action will result in incidental take of listed species but that the action and associated incidental take will not violate the ESA Section 7 jeopardy standard, the Service must attach an incidental take statement to the biological opinion.[23] 16 U.S.C. § 1536(b)(4); 50 C.F.R. 402.14(i)(1). The incidental take statement sets forth the predicted impact to listed species, the reasonable and prudent measures that are necessary to minimize take, and the terms and conditions for the implementation of those measures. *Id.* If the action agency complies with the terms and conditions of the incidental take statement, the expected take is exempted from the take prohibition set forth in ESA Section 9 (16 U.S.C. § 1538(a)(1)(B)). 16 U.S.C. § 1536(*o* )(2).

With regard to actions over which the federal agency remains in control or with which the federal agency has discretionary involvement, re-initiation of formal consul-

**20.** 50 C.F.R. § 402.12(a) states that a biological assessment "shall evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action and is used in determining whether formal consultation or a conference is necessary."

**21.** 50 C.F.R. § 402.13(a) provides:

Informal consultation is an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non-Federal representative, designed to assist the Federal agency in determining whether formal consultation or a conference is required. If during informal consultation it is determined by the Federal agency, with the written concurrence of the Service, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary.

**22.** 50 C.F.R. § 402.02 provides that " 'Jeopardize the continued existence of' means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."

**23.** The term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in such conduct." 16 U.S.C. § 1532(19).

tation is required in the following instances:

(a) If the amount or extent of taking specified in the incidental take statement is exceeded;

(b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

(c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or

(d) If a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. § 402.16.

### 2. Standing

The Federal Defendants challenge the Plaintiff's standing to bring the ESA claims alleged in Counts II–VI, arguing that the declarations filed by the Plaintiff's members fail to establish the requisite interest in the places and species at issue. Quoting *Ecological Rights Foundation v. Pacific Lumber Company*, 230 F.3d 1141, 1147 (9th Cir.2000), Defendants reason Plaintiff must show that its members have an "aesthetic or recreational interest in a particular place, animal, or plant species and that that interest is impaired by a defendant's conduct." Plaintiff has attempted to make the requisite showing by submitting declarations from four of its members stating that they work and recreate in areas containing species affected by the proposed action and that they have an active interest in such species. *See* Doc. No. 27 (Richard Halsey, stating an interest in 17 listed plant species in national forests in southern California, all of which received a "jeopardy" determination from the Fish and Wildlife Service, as well as three other listed species with designated critical habitat); Doc. No. 29 (John Grove, stating an interest in Montana's "trout

fisheries"); Doc. No. 32 (Sally Stefferud of Phoenix, Arizona, stating an interest in two listed fish species, both receiving a "jeopardy" determination from the Fish and Wildlife Service); Doc. No. 35 (James Johnston, stating an interest in one listed plant species and four listed fish species).

An organization seeking to assert standing on behalf of its members must demonstrate, among other things, that the individual members would have standing to sue in their own right. *Ecological Rights Foundation*, 230 F.3d at 1147. An individual member has standing if he can show an injury in fact that is "(a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical, ... the injury is fairly traceable to the challenged action of the defendant; and ... it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (quoting *Friends of the Earth v. Laidlaw Environmental Services*, 528 U.S. 167, 180–181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). The threshold for standing in environmental cases is flexible. *Ecological Rights Foundation*, 230 F.3d at 1150. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw*, 528 U.S. at 183, 120 S.Ct. 693 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). It is not necessary for the claimant to reside near the affected area, provided he can show that he has enjoyed and plans to continue to enjoy the recreational and aesthetic values of the area. "Repeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area

is injurious to that person." *Ecological Rights Foundation*, 230 F.3d at 1149.

 The Defendants make two arguments in support of their challenge the Plaintiff's standing. First, they claim the individual members have failed to provide evidence of concrete plans to observe the species at issue in the future. This argument fails because the declarations contain sufficient evidence of past use and plans for future use. *See* Halsey Declaration, Doc. No. 27 at ¶ 6 (15 visits last year and 15 planned visits this year); Stefferud Declaration, Doc. No. 32 at ¶ 2 (intending to continue visitation frequency of six times per year); Johnston Declaration, Doc. No. 35 at ¶ 2 (stating plans for "several business and recreational visits to national forest scheduled for 2009").

The primary case upon which the Defendants rely, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), is distinguishable. In *Lujan*, members of an environmental group sought to establish standing to challenge government-funded activities abroad, which the plaintiffs argued would affect endangered species in Egypt and Sri Lanka. *Id.* at 563, 112 S.Ct. 2130. The Court considered affidavits from two members who years before had traveled to Egypt and Sri Lanka, respectively, but neither of whom had concrete plans to do so again beyond a general statement of intent to return at some point in the future. *Id.* at 563–564, 112 S.Ct. 2130. The Supreme Court held that the absence of credible plans to visit the affected areas in the future meant plaintiffs could not show an injury in fact: "Such 'some day' intentions—without any description of concrete plans, or indeed any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Id.* at 564, 112 S.Ct. 2130 (emphasis in original).

In contrast to *Lujan*, the individual members here are regular visitors to the areas with credible plans to continue their use and enjoyment of the species in question. The *Lujan* plaintiffs each alleged a single visit that was years in the past, with nothing more than a general intent to return to a nation halfway around the world. The individual members here have established regular and repeated use of national forest lands containing the affected species, along with an intent to continue that use on multiple occasions within the next year.

 The Defendants' second argument against standing is that the Plaintiff's members have not alleged an interest in a sufficient number of species. In their Reply, the Defendants complain that Plaintiff's members "allege only an interest in a handful of the hundreds of species addressed by these biological opinions[.]" Doc. No. 40 at 10. The Defendants also note that the species listed in the individual members' declarations are almost entirely distinct from the species discussed in the Plaintiff's briefing. The thrust of the argument appears to be that by virtue of the Defendants' choice to take a programmatic planning approach covering over 400 endangered species, the Plaintiffs must respond with a "programmatic" injury in fact covering every species at issue.

Defendants cite no authority for this argument, and there are good reasons why it fails. The agencies have the resources and discretion to prepare nationwide planning documents, but it is unreasonable and impractical to require an environmental group to enlist a member with an interest in every covered species in order to satisfy the standing requirement. The standing requirement is intended to restrict the exercise of judicial power "to the traditional role of Anglo–American courts, which is to redress or prevent actual or imminently

threatened injury to persons caused by private or official violation of law." *Summers v. Earth Island Institute,* —— U.S. ——, 129 S.Ct. 1142, 1148, 173 L.Ed.2d 1 (2009). To require a showing of interest in every affected species, as the Defendants urge, would create an unnecessary and unjustified strategic incentive for an agency to prepare a programmatic biological opinion at every opportunity, as it would discourage legal challenge by forcing any potential plaintiff to scour the landscape seeking an afficionado of every last affected species.

The burden that such an approach would place on environmental plaintiffs is exemplified by the Defendants' argument with regard to the lack of commonality between the species mentioned in the declarations and the species discussed in the Plaintiff's briefing. Defendants attempt to undermine the individual members' standing by pointing out that the species in which they claim an interest are not, for the most part, the species discussed in the briefing. The argument ignores the fact that while there is no limit to the length of a biological opinion, the Plaintiff is subject to limitations on the length of its briefs; it is not practical to expect the Plaintiff to discuss more than 400 species individually. The Plaintiff may use examples of specific species to illustrate its claims without forfeiting its claims as to all other species. More importantly, the Defendant's argument shows a misconception about the nature of the Plaintiff's ESA claims; Plaintiff's arguments are not species-specific; that is, they are not rooted in the outcome of the analysis for particular species, but in the manner in which the ESA agencies performed their statutory and regulatory duties.

The declarations are adequate because they assert an interest in some species pertaining to each of the ESA counts. For example, the Johnston Declaration asserts an interest in the coastal coho salmon, steelhead, and Chinook salmon, all of which are the subject of a jeopardy/adverse modification finding by NOAA Fisheries. Doc. No. 35 at ¶ 7. These are species for which no incidental take statement has been issued, which is the basis for Plaintiff's ESA claim against NOAA Fisheries in Count II. The Halsey Declaration, Doc. No. 27 at ¶ 3, likewise lists several plant species for which the Fish and Wildlife Service made a "jeopardy" determination but did not issue an incidental take statement, which is the basis for the ESA claim against the Fish and Wildlife Service in Count III. The Stefferud Declaration asserts an interest in fish species for which the Fish and Wildlife Service made a "jeopardy" determination. Doc. No. 32 at ¶ 2. The Fish and Wildlife Service has concluded that its reasonable and prudent alternatives will alleviate the likelihood of jeopardy to the plants and fish in which these individual members have asserted an interest, and Count IV of the Second Amended Complaint challenges that conclusion as arbitrary and capricious. Count V alleges that the Fish and Wildlife Service failed to consider the value of critical habitat for recovery for dozens of species that were excluded from detailed analysis by the coarse filter. Among those species is the bull trout, which is one of the species listed in the Johnston Declaration. Doc. No. 35 at ¶ 7. Count VI alleges general defects in the Fish and Wildlife Service's analysis applicable to all species, including those in which the individual members have stated an interest. The Plaintiff has established standing through its individual members. The Defendants' standing challenge is rejected and the merits of the ESA claims will be considered.

Before doing so, it is necessary to briefly address the Supreme Court's recent opinion in *Summers. Summers* was decided after the briefing was complete in

this case, and addressed the question of environmental plaintiffs' standing to challenge the Forest Service's categorical exclusion regulations. The government sought review of an appellate ruling upholding the district court's adjudication of the merits of the plaintiffs' challenge despite the fact that the parties had already settled the dispute over the specific project at issue. The government argued that because of the settlement, there was no particular project at issue affecting the plaintiffs and thus they had no standing to challenge the regulations. The Supreme Court agreed, explaining that the lone declaration in support of standing was insufficient "because it was not tied to application of the challenged regulations, because it does not identify any particular site, and because it relates to past injury rather than imminent future injury that is sought to be enjoined." *Summers,* 129 S.Ct. at 1150.

*Summers* has little or no application to this case because the ruling in *Summers* hinged on the absence of a project that could result in injury to the plaintiffs. In this case there is a proposed action and the individual members have alleged an injury flowing from that action. Despite this clear distinction, both parties in this case made filings in response to the *Summers* opinion. The Defendants filed a Notice of Supplemental Authority on March 20, 2009, advising the Court of the opinion and offering a paragraph of legal argument. Doc. No. 44. Plaintiff responded by filing the Second Declaration of James Johnston (Doc. No. 45), purportedly to provide more specific information about the declarant's interests. The Second Johnston Declaration adds little to the first with regard to the declarant's standing, but includes many paragraphs of extra-record information on the effects of fire suppression, complete with citations to published research. Defendants filed a motion to strike the Second Johnston Declaration, arguing that it contains legal argument and expert testimony. Plaintiff filed a response stating that the Second Johnston Declaration relates only to the issue of standing, and accusing the Defendants of attempting to argue the standing implications of *Summers* in their motion to strike.

■ As a general rule, courts review agency action based only on the information before the agency at the time of the decision. *Southwest Center For Biological Diversity v. United States Forest Service,* 100 F.3d 1443, 1450 (9th Cir.1996). Under the four recognized exceptions to the rule, extra-record documents are permitted (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision; (2) when the agency has relied on documents not on the record; (3) when supplementing the record is necessary to explain technical terms or complex subject matter; and (4) upon showing of agency bad faith. *Id.* Plaintiff makes no effort to show that any one of these exceptions applies to the Second Johnston Declaration, insisting that it is offered only to establish standing. Because the Second Johnston Declaration does not add any meaningful information on the standing issue, and because it contains extra-record information that does not fall within one of the exceptions listed above, the Defendants' motion to strike the Second Johnston Declaration (Doc. No. 46) is GRANTED.

### 3. The Plaintiff's ESA Claims
#### a. The Coarse Filter (Counts V and VI)

Plaintiff argues that the Fish and Wildlife Service did not comply with the ESA when it relied upon its coarse filter analysis to reach a "no jeopardy" conclusion for 181 species. Plaintiff maintains the coarse filter's expedited analysis did not include the requisite discussion of critical habitat's

value for recovery, the direct and indirect effects of the action, and the environmental baseline for each species.

### i. Critical Habitat (Count V)

██ The Fish and Wildlife Service concluded that 181 species are "not likely to be jeopardized" through the use of the coarse filter analysis. USFS AR 339 at 11. The conclusions of the coarse filter analysis are set forth in spreadsheets rather than in narrative form. *See* Doc. No. 30–4. The coarse filter involved four prongs of analysis: species range and distribution, likelihood of exposure to retardant, likelihood of take from exposure, and likelihood that any take would result in jeopardy. *Id.* at 21–22. None of the four prongs deals with the value of critical habitat for recovery. At least 40 of the species analyzed under the coarse filter have designated critical habitat.[24]

██ Following the Ninth Circuit's decision in *Gifford Pinchot,* adverse modification to critical habitat occurs when an action causes "appreciable diminishment" of the value of critical habitat for survival *or* recovery. 378 F.3d at 1069–70 (invalidating regulation that effectively confined adverse modification analysis to affects on survival only). "Requiring some attention to recovery issues ... provides some reasonable assurance that the agency action in question will not appreciably reduce the odds of success for future recovery planning, by tipping a listed species too far into danger." *National Wildlife Federation v. National Marine Fisheries Service,* 524 F.3d 917, 936 (9th Cir.2008) (*"National Wildlife "*).

Plaintiff complains that for many of the species excluded from detailed analysis by the coarse filter, the Fish and Wildlife Service has conducted no analysis of the value critical habitat for recovery. The

Defendants retort by providing a handful of citations to the Biological Opinion where the analysis for certain species uses the words "survival," "recovery," and "conservation." None of those citations involve discussion of the 40 or more species for which the Fish and Wildlife Service limited its analysis to a series of fields in a spreadsheet. The Defendants point to the Biological Opinion's discussion of the effects of the action at the taxonomic group level, USFS AR 339 at 31–39, but they fail to explain how a discussion of the effects on an entire taxonomic group can support a finding as to the effects on the value for recovery of specific designated critical habitat for a specific species.

Defendants eventually concede, "It is true that, for several of the species identified by the Plaintiff (although not all), the [agency's] analysis is brief and set out largely in the coarse filter." Doc. No. 30–1 at 12. Even this description of the coarse filter analysis is generous. There are some species for which critical habitat is not even mentioned in the coarse filter spreadsheets. The discussion is not merely brief but nonexistent. Still, Defendants reason the Court should consider the coarse filter discussion adequate because the agency did the best it could considering the number of species involved: "In a consultation that involved 387 species and an action area of more than 192 million acres, the coarse filter was not only rational, but necessary." Doc. No. 30–1 at 11. Defendants cannot excuse the failure to comply with the law Congress by arguing that compliance would be too hard.

In their last effort to justify the failure to consider the value of critical habitat for recovery of the coarse filter species, Defendants cite language in which the *National Wildlife* court addresses the some-

---

**24.** The coarse filter spreadsheets that are provided for fish species and mammal species do not appear to indicate whether a species has designated critical habitat.

times close relationship between survival and recovery: "We recognize that these concepts [survival and recovery] are generally considered together in analyzing effects, and it is difficult to draw clear-cut distinctions." 524 F.3d at 932 n. 11 (citation, internal quotations omitted). Defendants omit the next sentence, which is fatal to their position. The *National Wildlife* court went on to add, "However, the agency may not resolve this difficulty by ignoring recovery needs and focusing entirely on survival, as it has claimed the right to do here." *Id.*

This is not a situation in which survival and recovery were adequately addressed in an intertwined discussion. Rather, the Fish and Wildlife Service sought to simplify its consultation responsibility by providing a superficial analysis for 181 threatened or endangered species. Defendants correctly point out that the law does not impose "an artificial obligation to include a section expressly discussing recovery for every species." Doc. No. 40 at 18. But that does not mean the agency can ignore critical habitat entirely, as it does for many species in its coarse filter analysis. The Plaintiffs are entitled to summary judgment on Count V. The proper remedy is remand of the Fish and Wildlife Service Biological Opinion so that the agency can conduct an assessment for each affected species of the likelihood of destruction or adverse modification of critical habitat that complies with the law.

#### ii. Scope of the Analysis

■ Plaintiff alleges that the Fish and Wildlife Service failed to comply with the ESA because the agency's reliance on the coarse filter in the Biological Opinion fails to evaluate the broader effects of fire suppression. Plaintiff complains that the coarse filter fails to consider the past and present impacts of fire suppression in setting the environmental baseline for each species, and that the coarse filter fails to analyze the direct and indirect effects of the action. As Plaintiff puts it, "There is indisputably one federal action that is ubiquitous whenever fire retardant is used and that often has profound and significant past and present impacts: fire suppression." In this argument Plaintiffs want a foot but get an inch.

In preparing a biological opinion on a proposed action, the Fish & Wildlife Service is required to "evaluate the effects of the action." 50 C.F.R. § 402.14. The term "effects of the action" is defined in the ESA's implementing regulations as:

> the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process.

50 C.F.R. § 402.02. The Service's Section 7 Consultation Handbook adds:

> The environmental baseline is a "snapshot" of a species' health at a specified point in time.... The baseline includes State, tribal, local, and private actions already affecting the species or that will occur contemporaneously with the consultation in progress. Unrelated Federal actions affecting the same species or critical habitat that have completed formal or informal consultation are also part of the environmental baseline, as are Federal and other actions within the

action area that may benefit listed species or critical habitat.

Final ESA Section 7 Consultation Handbook, March 1998 at 4–22.

Plaintiff's argument confuses the concept of environmental baseline with the effects analysis, alternately calling for fire suppression activities to be evaluated as part of the environmental baseline and as part of the direct and indirect effects of the action. The two analyses are distinct. The environmental baseline is a description of the status quo, i.e., the current condition of the species *before* the proposed action, along with its direct and indirect effects, takes place. Thus it is incongruous for Plaintiff to assert that "fire suppression is a part of the environmental baseline associated with fire retardant use" Doc. No. 25–1 at 10. The environmental baseline is associated with the species, not the project; the particular characteristics of the project are irrelevant to the establishment of an environmental baseline.

This confusion makes it difficult to discern the precise argument offered by the Plaintiff. The most plausible reading, and the one consistent with Plaintiff's similar arguments about the scope of the NEPA analysis, is that Plaintiff wants the agency's analysis of direct and indirect effects of the action to include an analysis of all fire suppression activities. Any such attempt to expand the scope of the proposed action fails for the same reason Plaintiff's argument for a broader NEPA analysis fails: this Court did not order, and the Forest Service did not perform, an analysis of fire suppression generally. The scope of consultation should match the scope of the proposed action, and that scope is limited to the use of aerially-applied fire retardant. The Defendants are entitled to summary judgment on Count VI.

### b. The Reasonable and Prudent Alternatives (Count IV)

The Fish and Wildlife Service concluded that the use of fire retardant as proposed by the Forest Service is likely to result in jeopardy or destruction/adverse modification for 45 species, including plants, insects, freshwater mussels, fish and amphibians. The conclusion is based on the likelihood of the following adverse effects: increases in invasive species, loss of a substantial fraction of population or habitat, and harm to soil chemistry and plant physiology (plants); toxicity, sub-lethal physiological harm and loss of macro-invertebrate prey (freshwater mussels), increases in invasive species, physiological effects, and death (insects); sub-lethal physiological effects and direct mortality to individuals and populations (fish); and direct mortality (amphibians). The Fish and Wildlife Service issued a reasonable and prudent alternative that it concludes will avoid jeopardy or destruction/adverse modification for these species. USFS AR 339 at 118–120.

The reasonable and prudent alternative requires the Forest Service to develop species-specific measures to be implemented during fire response emergencies. USFS AR 339 at 119. The measures must include preparation of current maps of the distribution of listed species to be given to incident commanders, as well as conservation protocols, such as enhancement of populations, to reduce jeopardy after an emergency. *Id.* The reasonable and prudent alternative requires that "[w]herever practical," the Forest Service should prioritize fuels reduction projects near listed species or critical habitat, to reduce the likelihood of wildfire affecting the area. *Id.* Another requirement holds that, "[w]henever practical, [the Forest Service] will use water or other less toxic fire retardants than those described in the proposed

action within areas designated critical habitat or occupied by species" that are likely to be jeopardized. *Id.* The species-specific measures must also provide for emergency consultation any time fire retardant is dropped on critical habitat or areas occupied by species that are likely to be jeopardized. *Id.* Emergency consultation "may" include monitoring, compensation for population declines, and removal of non-native plant species and weeds. *Id.* Despite the imposition of this reasonable and prudent alternative, the Fish and Wildlife Service makes clear that its Biological Opinion "in no way limits the actions that an incident commander deems necessary to undertake during a fire emergency response." USFS AR 339 at 120.

Plaintiff holds that the Fish and Wildlife Service's Biological Opinion is arbitrary and capricious because it relies upon a reasonable and prudent alternative that imposes no true restrictions on the use of aerially-applied fire retardant, and thus does not avoid jeopardy and destruction/adverse modification of critical habitat. The challenge to the reasonable and prudent alternative is rooted in the absence of any binding limitation on the discretion of incident commanders to use fire retardant. Both the 2000 Guidelines and the reasonable and prudent alternative contain subjective language qualifying the restrictions on retardant use in a way that leaves the ultimate discretion with the incident commander. The Defendants admit as much in their Response brief when they write,

> In fact, the [Fish and Wildlife Service] considered including restrictions on the use of fire retardants in the [reasonable

and prudent alternative], but decided against it. "since we are not fire fighting experts," the [Fish and Wildlife Service] reasoned, "we should not be interfering with fire fighting decision makers in their ability to respond to a given emergency by using the tools they deem appropriate." The [Fish and Wildlife Service] was understandably concerned that blanket restrictions on the [use of fire retardant], especially applied at this programmatic level and without the benefit of a site-specific analysis, could result in the loss of homes or even human lives.

Doc. No. 30–1 at 15 (citations omitted).

This concession is fatal to the Fish and Wildlife Service Biological Opinion, because it reveals that the agency ignored the requirement that listed species "be afforded the highest of priorities." *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 174, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).[25] The Fish and Wildlife Service has elevated fire suppression over the protection of jeopardized listed species. The approach taken by the Fish and Wildlife Service is exemplified by the following language taken from an agency official explaining in an email message why the agency would not impose restrictions on the use of fire retardant near endangered populations as a reasonable and prudent alternative:

> We have concerns regarding the potential consequences if we did restrict the use of fire retardant in any area. In a worse case scenario, if someone lost their home, or—God forbid—their life, the Service (and, by extension, the ESA) could be blamed (rightly or wrongly) for

**25.** The parties both devote much argument to their dispute over whether the reasonable and prudent alternative constitutes a mitigation measure that is reasonably likely to occur. The reasonable and prudent alternative, as written, is not difficult to implement, and there is no reason to believe implementation will not occur. The problem, and the crux of the Plaintiff's argument, is that the reasonable and prudent alternative is inadequate to protect listed species, so even when it is fully implemented it will not effectively prevent jeopardy and/or destruction/adverse modification of critical habitat.

not "allowing" the use of fire retardant. Of course, if the FS chooses to restrict their own use of retardant that is their prerogative, but we should not be requiring that restriction.

FWS AR WO at 666.[26] *See also* FWS AR WO at 649, in which an employee of the agency's Region 5 wrote, "[A]t this time, there does not appear to be an RPA other than *not* using fire retardant on certain parts of the Forests, which we were advised by [the Washington Office] was not an option." This determination is not scientific, it is political decision making by the Fish and Wildlife Service.

After explaining that the agency chose not include concrete restrictions on the use of fire retardant because it did not want to interfere with firefighting, Defendants switch gears and attempt to save the reasonable and prudent alternative by claiming that it will impose meaningful constraints. They do not agree with the Plaintiff's characterization of the reasonable and prudent alternative as toothless, and assert, without citing any support in the record, that "[t]he terms of the [Biological Opinion] ... do not leave these decisions to the discretion of the [Forest Service] and instead invoke objective standards." Doc. No. 40 at 17. The Defendants point to the Biological Opinion's requirement that emergency consultation be performed each time retardant is used in an area where it could affect a listed species or critical habitat, suggesting that these site-specific consultations will ensure that fire retardant is not used in a way that will result in jeopardy or destruction/adverse modification. The argument, in essence, is that the Court should disregard the Fish and Wildlife Service's own admissions about the advisory nature of the reasonable and prudent alternative because the agency can be trusted to impose the restrictions necessary to protect listed species during emergency consultation. Congress did not intend the process to be subject to labile and shifting political winds.

Given the deferential tenor of the Fish and Wildlife Service's Section 7 consultation on fire retardant to this point, any suggestion that the agency will impose meaningful restrictions during emergency consultation is questionable.[27] As the Fish and Wildlife Service has candidly admitted, the agency was unwilling to impose the restrictions necessary to protect listed species in its Biological Opinion because it placed a higher priority on fire suppression than on the avoidance of jeopardy or destruction/adverse modification. There is no factual reason to assume that the agency will show any more concern for listed species during emergency consultation, when the exigency of the situation elevates political considerations while leaving little time for deliberation.

The Fish and Wildlife Service acted in an arbitrary and capricious manner when it concluded that the reasonable and prudent alternative would prevent jeopardy and/or destruction/adverse modification. The Plaintiff is entitled to summary judgment on Count IV, and the Biological Opinion is remanded to the agency for further proceedings consistent with the law.

---

**26.** Citations to the Fish and Wildlife Service Administrative Record for the agency's Washington Office are in the following format: FWS WO at [page number].

**27.** Another problem with the agencies' reliance on emergency consultation, discussed in greater detail in the next section, is that by deferring until the emergency consultation stage the important function of protecting listed species from jeopardy, the agencies may run afoul of this Court's holding in the 2003 case forbidding the agencies from relying on solely on the emergency consultation regulation. 397 F.Supp.2d at 1257.

## c. Failure to Include Incidental Take Statements (Counts II and III)

■ Both of the ESA agencies found jeopardy and/or adverse modification and issued reasonable and prudent alternatives, but neither agency included an incidental take statement in its biological opinion. NOAA Fisheries blamed its failure to include such a statement on the uncertainty over where and to what extent retardant will be used, and stated that it would authorize take on a case-by-case basis through the emergency consultation process. USFS AR 1075 at 143–144. The Fish and Wildlife Service stated a similar intention to rely on the emergency consultation regulation to authorize take for each fire response action. USFS AR 339 at 120. Despite the absence of an incidental take statement, the Fish and Wildlife Service Biological Opinion contains a re-initiation statement requiring re-initiation of formal consultation if "the amount or extent of incidental take is exceeded." *Id.* Plaintiff maintains that the ESA agencies violated the law when they failed include incidental take statements in their biological opinions.

Section 7 of the ESA states that a biological opinion "shall" include a written incidental take statement any time an ESA agency offers reasonable and prudent alternatives to avoid jeopardy and concludes that the taking of listed species incidental to the action will not violate Section 7(a)(2). 16 U.S.C. § 1536(b)(4). Both biological opinions offer reasonable and prudent alternatives, but Defendants contend because the opinions do not authorize any incidental take, it is impossible for the ESA agencies to have concluded that incidental take will not violate Section 7, and therefore an incidental take statement is not required.

Defendants argue the ESA agencies are not required to issue incidental take statements because they issued programmatic biological opinions for which such statements are not required under *Gifford Pinchot.* In that case, the Ninth Circuit upheld a biological opinion for a forest plan that declined to address the impacts of any specific action and deferred consideration of incidental takes to future biological opinions addressing specific projects. 378 F.3d at 1064, 1067–1068. The court noted that it has "previously approved programmatic environmental analysis supplemented by later project-specific environmental analysis." *Id.* at 1068. It also expressed reluctance to fault the Fish and Wildlife Service for relying on the analysis in the forest plan because the court had already approved the forest plan. *Id.*

*Gifford Pinchot* does not stand for the proposition that programmatic biological opinions are excused from the incidental take requirement. It merely holds that where an ESA agency relies on the analysis of a pre-approved forest plan, a programmatic biological opinion need not address incidental take, provided the analysis is supplemented by site-specific biological opinions in the future. That holding does little to help the Defendants here, because (1) the ESA agencies did not rely on a pre-approved analysis and (2) the site-specific analyses that the ESA agencies plan to rely on for their incidental take statements will not involve the preparation of biological opinions as contemplated in *Gifford Pinchot,* but rather an expedited emergency consultation pursuant to 50 C.F.R. § 402.05.

Defendants also rely on the district court's opinion in *Western Watersheds Project v. Bureau of Land Management,* 552 F.Supp.2d 1113 (D.Nev.2008). In that case, the Bureau of Land Management amended two land resource management plans covering an area of 7.5 million acres "to provide direction and continuity in establishing operational procedures to guide

all fire management activities." *Id.* at 1120. The amendments had four components: general fire management, fire prevention, fire suppression, and fire rehabilitation. *Id.* The Fish and Wildlife Service prepared a biological opinion finding that the proposed action would likely have adverse effects on listed species but would not likely result in jeopardy. *Id.* at 1138. The biological opinion did not contain an incidental take statement, saying, "incidental take and reasonable and prudent measures may be identified adequately through subsequent actions subject to section 7 consultations at the project and/or programmatic scale." *Id.* at 1138–1139. Relying on Gifford Pinchot, the Nevada district court held it was permissible for the agency to issue an incidental take statement "at the time a specific project is authorized." *Id.* at 1139.

As is the case with *Gifford Pinchot,* Defendants' reliance on *Western Watersheds* does not support their claim because the district court's approval of the programmatic biological opinion is contingent upon the agency's promise to prepare project-specific biological opinions. Plaintiff assigns elevated importance to *Western Watersheds* because it involves a fire management plan, one component of which is fire suppression. But the important issue here is not whether the action involves fire; rather it is whether the action will be evaluated in a subsequent biological opinion. In *Western Watersheds,* the answer is yes; the opinion contains no mention of emergency consultation or 50 C.F.R. § 402.05. In this case, the answer is no; the ESA agencies make clear in their biological opinions that they expect all guidance on incidental take to be developed during emergency consultation.

The fundamental problem with the ESA agencies' failure to issue incidental take statements is that they justify their failure by promising to evaluate all actual uses of fire retardant during emergency consultation. This Court's opinion in the 2003 case explained that reliance on emergency consultation was not sufficient to satisfy the ESA:

> There is nothing in the case law or statutes to suggest that the ESA permits certain agency actions to be exclusively evaluated under the lesser strictures of the emergency consultation procedures of 50 C.F.R. § 402.05. The requirement in emergency situations that formal consultation be initiated as soon as practicable after the emergency is under control demonstrates that under the ESA framework, emergency consultation is intended to be the exception, not the rule. The emergency exception is meant for unexpected exigencies. The use of fire retardant by the [Forest Service] is not unexpected but guaranteed; the only question is when and where it will be used. There is no reason why the [Forest Service] cannot conduct formal consultation with [Fish and Wildlife Service] and no reason to find that the ESA requires anything less.

397 F.Supp.2d at 1257.

The Plaintiff argues that the ESA agencies have essentially allowed fire suppression personnel the unlimited freedom to take listed species because they have failed to provide a trigger for re-initiation of consultation or an exemption from the consequences of unauthorized take under ESA Section 9. By the time post-hoc consultation is complete, Plaintiff argues, it may be too late for a species that has already been jeopardized by retardant use approved during the emergency. The Defendants counter by insisting that *no* incidental take is authorized in the biological opinions, and thus there is a trigger for re-initiated consultation: the Forest Service must consult any time it uses retardant.

The problem with the ESA agencies' approach is that it means that the first and only meaningful analysis under Section 7(a)(2) will occur during emergency consultation. This tactic leaves the impression of circumventing the Court's ruling in the 2003 case by preparing biological opinions that purportedly constitute Section 7 consultation, while deferring significant aspects of the required Section 7 analysis until emergency consultation. This is arguably the same exclusive reliance on emergency consultation that the Court has already rejected.

The one palatable argument [28] in defense of the biological opinions is that the unpredictable location and severity of wildfire makes it impossible for the agencies to specify the impact of incidental taking on the species, as the statute requires. There is some merit in the argument that an incidental take statement for each species would amount to little more than a guessing game. The counter-argument is that incidental take statements are needed here not because of their predictive value, but because they would serve as a last line of defense for the species, specifying an amount of take that may not be exceeded under Section 9. In this respect, the Plaintiff's argument about incidental take statements is subsumed in its broader objection to the ESA process in this case, which is that the process has not produced any concrete restrictions on the ability of fire suppression personnel to take listed species. Plaintiff is suspicious of the emergency consultation process and does not trust the Forest Service and the ESA agencies, when engaged in expedited consultation in the heat of the moment, to constrain fire suppression activities for the protection of the listed species. Subjective distrust, however, cannot dictate the resolution of the legal issue.

The outcome on this issue depends on the effectiveness of emergency consultation. This is a close question largely because, as is discussed *infra*, the reasonable and prudent alternatives do not impose any concrete restrictions on incident commanders responding to wildfires. If the ESA agencies had imposed meaningful constraints intended to avoid jeopardy or adverse modification, reliance on emergency consultation would not seem so perilous, because the agencies would not be left entirely to their own devices during consultation. This issue ultimately relates back to the adequacy of the reasonable and prudent alternatives. The issue is resolved as to the Fish and Wildlife Service because the reasonable and prudent alternative imposed by the Fish and Wildlife Service is inadequate.

The matter is more problematic where NOAA Fisheries is concerned because the Plaintiff does not challenge any other aspect of the NOAA Fisheries Biological Opinion. In light of the foregoing analysis and the ruling in the 2003 case disfavoring exclusive reliance on emergency consultation, the failure to include an incidental take statement is a violation of the ESA. The cases cited by the Defendants allowed programmatic biological opinions to omit incidental take statements only where the court was satisfied that a second, site-specific biological opinion would be pre-

---

**28.** Defendants distort the holding of *Arizona Cattle Growers' Association v. United States Fish and Wildlife*, 273 F.3d 1229 (9th Cir. 2001), to support an argument that it is unlawful for the ESA agencies to provide incidental take statements in this case. In that case the court found that the agency action was arbitrary and capricious because it issued an incidental take statement without showing that the listed species in question was present in the affected area: "Where the agency purports to impose conditions on the lawful use of that land without showing that the species exists on it, it acts beyond its authority[.]" *Id.* at 1244. The holding has no application here.

pared. Here, all that stands between the listed species and take from exposure to fire retardant is an undefined emergency consultation process. The systematic deferral until emergency consultation of a significant aspect of the agency's consultation role is tantamount to evaluating the action exclusively through emergency consultation, an approach that has already been rejected.

The Plaintiff is entitled to summary judgment on Counts II and III, and the biological opinions are remanded to the respective agencies for further proceedings consistent with the law, including the preparation of an incidental take statement as required by statute.

### IV. Order

Based on the foregoing, IT IS HEREBY ORDERED that the parties' motions for summary judgment are granted in part and denied in part as follows: summary judgment is GRANTED for Plaintiff (Doc. No. 22) and against Defendants on Counts I, II, III, IV, and V; summary judgment is GRANTED for Defendants (Doc. No. 30) and against Plaintiff on Count VI; and Defendants' motion to strike the Second Johnston Declaration (Doc. No. 46) is GRANTED. The Environmental Assessment and biological opinions are set aside and remanded for further proceedings consistent with the law.

IT IS FURTHER ORDERED that on remand, the Forest Service shall complete consultation with the ESA agencies, complete the NEPA process and issue a final decision no later than December 31, 2011. The Federal Defendants are advised that failure to comply with this deadline may subject them to sanctions, including contempt proceedings, and could conceivably result in enjoining the continued use of aerially-applied fire retardant until the law enacted by Congress is complied with. The issue requires immediate attention.

IT IS FURTHER ORDERED that Plaintiff's request for additional briefing regarding the appropriate remedy is DENIED.